EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Total Petroleum Puerto Rico Corp.

Apelados

v.

Autoridad de los Puertos de Puerto
Rico; Aerostar Airport Holding, LLC

Apelantes


PUMA Energy Caribe LLC (PUMA)

Apelados

_____

Autoridad de los Puertos de Puerto
Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

_____

Total Petroleum Puerto Rico Corp.

Apelados

v.

Autoridad de los Puertos de Puerto
Rico

Apelante

Aerostar Airport Holding, LLC

Apelados

_____

Autoridad de los Puertos de Puerto
Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

Certiorari

2022 TSPR 89

209 DPR ____

BR Products North America Inc.; Total Petroleum Puerto Rico Corp.

Apelados


Total Petroleum Puerto Rico Corp.

Apelados


v.

Autoridad de los Puertos de Puerto Rico; Aerostar Airport Holding, LLC

Apelantes

_____

Autoridad de los Puertos de Puerto Rico

Apelante


v.

Aerostar Airport Holding, LLC

Apelados

_____

Total Petroleum Puerto Rico Corp.

Apelados


v.

Autoridad de los Puertos de Puerto Rico; Aerostar Airport Holding, LLC

Apelantes


_____

Autoridad de los Puertos de Puerto Rico

Apelante


v.

Aerostar Airport Holding, LLC

Apelados

Número del Caso:  AC-2020-47

Fecha: 30 de junio de 2022

Tribunal de Apelaciones:

Panel II

Abogados de la parte apelante:

Lcdo. Heriberto López Guzmán
Lcdo. Thomas Trebilcock Horan

Abogados de las partes apeladas:

**Total Petroleum P.R.**

Lcdo. Lee Sepulvado Ramos
Lcdo. Albeniz Couret Fuentes

**Puma Energy**

Lcda. Margarita Mercado Echegaray

**Aerostar Airport Holdings**

Lcdo. Roberto A. Cámara Fuertes
Lcdo. Jaime Mercado Almodóvar
Lcda. Suleicka Tulier Vazquez

Materia: Derecho Constitucional y Obligaciones y Contratos: Cesión del cobro del derecho de dos centavos por galón de combustible de aviación (fuel fee). Inexistencia de menoscabo de obligaciones contractuales.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Total Petroleum Puerto Rico Corp.

      Apelados

v.

Autoridad de los Puertos de Puerto Rico; Aerostar Airport Holding, LLC

      Apelantes

PUMA Energy Caribe LLC (PUMA)

      Apelados

AC-2020-0047

_____

Autoridad de los Puertos de Puerto Rico

      Apelante

v.

Aerostar Airport Holding, LLC

      Apelados

_____

Total Petroleum Puerto Rico Corp.

      Apelados

v.

Autoridad de los Puertos de Puerto

Rico

      Apelante

Aerostar Airport Holding, LLC

Apelados

_____

Autoridad de los Puertos de Puerto Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

BR Products North America Inc.; Total Petroleum Puerto Rico Corp.

Apelados

Total Petroleum Puerto Rico Corp.

Apelados

v.

Autoridad de los Puertos de Puerto Rico; Aerostar Airport Holding, LLC

Apelantes

_____

Autoridad de los Puertos de Puerto Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

_____

Total Petroleum Puerto Rico Corp.

Apelados

v.

Autoridad de los Puertos de Puerto Rico; Aerostar Airport Holding, LLC

Apelantes

_____

Autoridad de los Puertos de Puerto Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 30 de junio de 2022.

Nos corresponde determinar si la facultad de cobrar el derecho de dos centavos ($0.02) por galón de combustible de aviación, establecido en la Ley Núm. 82 de 26 de junio de 1959, *infra*, y posteriormente incluido en el Código de Rentas Internas de Puerto Rico, *infra*, fue cedido por la Autoridad de los Puertos de Puerto Rico (en adelante, Autoridad de los Puertos) a Aerostar Airport Holdings, LLC (en adelante, Aerostar). Lo evaluamos a la luz de la otorgación del *Luis Muñoz Marín International Airport Lease Agreement*, contrato en el que Aerostar se convirtió

en arrendataria y operadora del Aeropuerto Internacional Luis Muñoz Marín (en adelante, Aeropuerto Internacional).

De igual forma, debemos resolver si el Tribunal de Apelaciones erró al dictaminar que la aprobación de la Ley Núm. 206-2014, infringió el Art. II, Sec. 7, de la Constitución de Puerto Rico, por menoscabar las obligaciones contractuales entre la Autoridad de los Puertos y Aerostar.

I

El 24 de julio de 2012, la Autoridad de los Puertos suscribió un contrato con Aerostar mediante el cual esta última se convirtió en arrendataria y operadora del Aeropuerto Internacional. Como parte del acuerdo, la Autoridad de los Puertos le transfirió a Aerostar el derecho de cobrar una serie de tarifas, rentas, recaudos o cualquier cargo relacionado con las facilidades del Aeropuerto Internacional. Sección 7.1 del Lease Agreement.

Posteriormente, entrada la nueva administración del Hon. Alejandro García Padilla, el 27 de febrero de 2013 la Autoridad de los Puertos cedió a Aerostar sus derechos e intereses en una serie de contratos, en particular los contratos de distribución de combustible en el Aeropuerto Internacional (en adelante, *Assigment and Assumption Agreement*).

A raíz del acuerdo entre las partes, el 28 de febrero de 2013 la Autoridad de los Puertos, por conducto de su director ejecutivo Víctor Suárez, notificó a Total y BP-

compañías encargadas del almacenamiento y distribución de combustible en los predios del Aeropuerto Internacional, que remitieran a Aerostar el pago correspondiente al cargo de dos centavos ($0.02) por cada galón de combustible, conocido como *fuel fee*. Notice of Assigment, Apéndice, pág. 299.

Trascurridos apenas ocho meses desde la discutida notificación, la Autoridad de los Puertos le envió cartas a Total y BP requiriendo que devolvieran el pago del *fuel fee* hecho a Aerostar desde el 28 de febrero de 2013 y ordenando que realizaran los pagos subsiguientes a la Autoridad de los Puertos. Al enfrentarse con instrucciones contradictorias, Total decidió depositar el pago del *fuel fee* en una cuenta *escrow*, hasta tanto la Autoridad de los Puertos y Aerostar dilucidaran a quién le correspondía cobrar el *fuel fee*. Asimismo, Total presentó una demanda para obligar que la Autoridad de los Puertos y Aerostar litigaran entre sí y, de esta manera, determinar a quién le corresponde cobrar el referido cargo.

Por un lado, Aerostar argumentó que conforme al *Lease Agreement y el Assigment and Assumption Agreement*, se le cedió el derecho de cobrar el *fuel fee*. Por su parte, la Autoridad de los Puertos arguyó que el *fuel fee* no se puede transferir, pues entiende, que la Ley Núm. 82 de 26 de junio de 1959, infra, no lo permite. De igual forma, entiende que los contratos entre las partes no son claros en cuanto a la alegada cesión del cargo en controversia.

Mientras la controversia se encontraba ante la consideración del foro primario, se aprobó la Ley Núm. 206-2014, a los fines de determinar que los "importadores" y no los "suplidores" -como era al momento de los hechos- son los responsables de pagar el *fuel fee*. Además, definió el término "importador" e incluyó un párrafo a los efectos de expresar que el "importador" le debía pagar a la Autoridad de los Puertos el correspondiente *fuel fee*. Sec. Ley Núm. 206-2014 (2014 (Parte 3) Leyes de Puerto Rico 1985-1987.

Aerostar, oportunamente, impugnó la constitucionalidad de la nueva ley, aduciendo que menoscababa el acuerdo contractual que tenía con la Autoridad de los Puertos. Según Aerostar, la aprobación de la precitada pieza legislativa facultaba a la Autoridad de los Puertos a compeler el pago del *fuel fee*, en violación de la jurisdicción del foro primario. Además, sostuvo que la inclusión de un lenguaje a los efectos de que el pago del *fuel fee* se haría a la Autoridad de los Puertos, era contrario a los contratado entre las partes.

Luego de varios trámites, que no es necesario discutir para la correcta disposición de la controversia, el Tribunal de Primera Instancia dictó sentencia parcial en la que resolvió que Aerostar era la parte autorizada a cobrar el *fuel fee* y concluyó que el cargo en controversia era un ingreso derivado de la operación del Aeropuerto Internacional y, como tal, fue válidamente cedido a

Aerostar mediante el *Lease Agreement*. Sin embargo, respecto a la constitucionalidad de la Ley Núm. 206-2014, concluyó que esta había creado un derecho de dos centavos ($0.02) por cada galón de combustible separado al *fuel fee* a ser cobrado por la Autoridad de los Puertos y que, contrario al cargo que Aerostar cobraría, esta tarifa sería pagada por los importadores de combustible y no por los suplidores.

Inconforme, la Autoridad de los Puertos presentó un recurso de apelación ante el Tribunal de Apelaciones. Nuevamente, arguyó que no había cedido a Aerostar el derecho a cobrar el *fuel fee*, porque este era intransferible. De igual forma, Aerostar también presentó un recurso de apelación y arguyó que la Ley Núm. 206-2014 era inconstitucional por menoscabar sus obligaciones contractuales con la Autoridad de los Puertos.

Evaluada la comparecencia de las partes y tras celebrar una vista oral, el foro intermedio revocó parcialmente el dictamen del foro primario. Resolvió que el derecho a cobrar el *fuel fee* fue válidamente transferido a Aerostar como parte del *Lease Agreement*. Por otra parte, concluyó que la aprobación de la Ley Núm. 206-2014 no tuvo el propósito de crear un nuevo derecho de dos centavos ($0.02) por galón de combustible de aviación, sino que meramente buscaba enmendar la tarifa establecida por la Ley Núm. 82 de 26 de junio de 1959, infra. Así, declaró inconstitucional la Ley Núm. 206-2014, por

entender que esta tenía el efecto de menoscabar los derechos contractuales de Aerostar sobre el cobro del *fuel fee*.

Aún inconforme, la Autoridad de los Puertos apela ante nos. El Art. 3.002 (b) de la Ley Núm. 201-2003, conocida como la Ley de la Judicatura de 2003, 4 LPRA sec. 24s(b), establece que este Tribunal tendrá competencia para revisar mediante apelación las sentencias finales que dicte el Tribunal de Apelaciones si se ha determinado la inconstitucionalidad de una "ley, reglamento, ordenanza municipal o de una resolución conjunta, resolución concurrente, regla o reglamento de una agencia o instrumentalidad pública, u ordenanza municipal, al amparo de la Constitución de los Estados Unidos de América o de la Constitución del Estado Libre Asociado de Puerto Rico." En el caso ante nuestra consideración el Tribunal de Apelaciones declaró inconstitucional la Ley Núm. 206-2014. Por lo tanto, se cumple con lo dispuesto en el citado artículo y procede la presentación de un recurso de apelación.

La Autoridad de los Puertos arguye que el Tribunal de Apelaciones erró al desviarse de la letra de la Ley Núm. 82 de 26 de junio de 1959, infra, la cual, a su entender, exime el pago del arbitrio sobre el combustible de aviación condicionado a que sea la Autoridad de los Puertos (y no sus sucesores o cesionarios) la entidad que siempre imponga y cobre el derecho personalísimo de $0.02

centavos. Además, alega que el foro intermedio erró al efectuar una lectura incorrecta de los contratos en controversia y hacer un uso selectivo de cierta prueba extrínseca. Por último, la Autoridad de los Puertos arguye que el foro intermedio erró al declarar inconstitucional la Ley Núm. 206-2014, cuando Aerostar no tiene derecho contractual para cobrar el *fuel fee*.

Tras la comparecencia de las partes, procedemos a resolver.

## II

Con el propósito de desarrollar la industria del Turismo, fomentar la economía local y atajar la incomunicación entre la Isla y los Estados Unidos continentales, "principal obstáculo para promover el desarrollo y la equidad", el Gobierno federal y el Gobierno de Puerto Rico impulsaron la construcción del Aeropuerto Internacional. E. Pérez Maldonado, Un vuelo a la Modernidad: El Aeropuerto Internacional, 1era ed., 2020, págs. 31,32 y 38. Este fue inaugurado el 22 de mayo de 1955. Íd., pág. 10. Apenas cuatro años después de su inauguración, la Asamblea Legislativa aprobó la Ley de Imposición y Cobro de Contribución al Combustible de Aviación, Ley Núm. 82 de 26 de junio de 1959, 13 LPRA sec. 4030 et seq.

Esta medida legislativa tuvo como propósito facultar a la Autoridad de los Puertos el cobro de dos centavos por galón de combustible para uso o consumo en viajes por aire

dentro de los límites territoriales de Puerto Rico, para que esta instrumentalidad pudiera hacer mejoras a las facilidades del Aeropuerto Internacional. Así queda claro del trámite legislativo de la Ley Núm. 82 de 1959, supra. Véase Esso Standard Oil v. A.P.P.R., 95 DPR 772, 777 (1968). En ese caso, citamos el informe de la Comisión de Hacienda del Senado de Puerto Rico sobre el Proyecto de la Cámara Núm. 663, el cual se convirtió en la Ley Núm. 82 de 1959, supra. El Informe exponía lo siguiente:

> **Este proyecto** suspende la imposición y cobro de la contribución sobre combustible de aviación y deroga la Resolución Conjunta Núm. 103 aprobada en 24 de junio de 1958 y al mismo tiempo **faculta a la Autoridad de los Puertos a imponer un derecho de dos centavos por galón o fracción de galón de combustible para uso o consumo en viajes por aire dentro de los límites territoriales de Puerto Rico.**
>
> **La Autoridad de los Puertos tiene necesidad de hacer mejoras y ampliaciones en el Aeropuerto Internacional y para ello necesita emitir bonos de renta.** Hasta ahora, según se informa a la Comisión, no ha habido mercado disponible para esos bonos de la Autoridad de los Puertos, en razón a que los únicos fondos con que contaría la Autoridad para hacerle frente a esos bonos sería la asignación autorrenovable [sic] aprobada por la Resolución Conjunta Núm. 103, la cual podía ser derogada por la Asamblea Legislativa. Esta posibilidad como es natural crea cierto estado de inseguridad en los inversionistas. **Para hacerle frente a esto es que se presenta este Proyecto de Ley, dándole poder a la Autoridad de los Puertos para imponer el derecho ya expresado. La Autoridad, a base de esto, podría emitir bonos que se pagarían con el impuesto de ese derecho.** (Énfasis nuestro). Íd., citando el Diario de Sesiones, Vol. 12, tomo 3 (1959) a la pág. 1584.

Se desprende con claridad la intención del legislador de facultar a la Autoridad de los Puertos a imponer el derecho de dos centavos por galón de combustible con el fin de sufragar los gastos de mantenimiento y mejoras del Aeropuerto Internacional. Como sabemos, la mencionada entidad era la instrumentalidad del Gobierno encargada de la administración y por consiguiente del mantenimiento y mejoras de las facilidades del Aeropuerto Internacional. Esto cambió con la otorgación del contrato de arrendamiento entre la Autoridad de los Puertos y Aerostar. Como consecuencia, Aerostar se hizo cargo de la administración, mantenimiento y mejoras de las facilidades del Aeropuerto Internacional. Es ante esa realidad que la Autoridad de los Puertos le cede a Aerostar el *fuel fee* para que lo utilice en la administración, mantenimiento y mejoras de las facilidades del Aeropuerto Internacional; el mismo propósito para el cual el legislador autorizó a la Autoridad de los Puertos a cobrar el *fuel fee* en primer lugar.

Ahora bien, la Autoridad de los Puertos argumenta que "[b]asado en una lectura fiel y exacta del estatuto [Ley 82 del 1959, supra], ... [están] imposibilita[dos] de transferir el *fuel fee*". Alegato Autoridad de los Puertos, pág. 7. Además, alega que el *fuel fee* no se puede ceder porque es un impuesto (contribución) y que, por lo tanto, "estamos ante un asunto de rango Constitucional y, con más precisión, frente a un poder soberano que nunca (o sea, en

ninguna circunstancia) podrá ser rendido o suspendido".
Íd., pág. 8.

La Autoridad de los Puertos se equivoca. En Esso Standard Oil v. A.P.P.R., supra, nos correspondió determinar si la naturaleza del fuel fee era un derecho o una contribución. Concluimos que resultaba "evidente que el derecho que la Asamblea Legislativa autorizó a la recurrida [Autoridad de los Puertos] a cobrar, es, en efecto, un derecho (fee) por servicio o uso de facilidades y no una contribución como aquella a la cual sustituyó...". Íd., pág. 786. Por lo tanto, no cabe hablar de que el fuel fee es un impuesto que la Autoridad de los Puertos está impedida de transferir.

Además, del texto de la Ley 82 de 26 de junio de 1959, supra, no se desprende prohibición alguna a que la Autoridad de los Puertos pueda transferir el fuel fee. De igual forma, un estudio de las disposiciones del Lease Agreement y el Assignment and Assumption Agreement queda claro que la Autoridad de los Puertos cedió a Aerostar el cobro del fuel fee. En la Sec. 2.1(a)(ii)(B) del Lease Agreement se establece: "(ii) the Authority shall and hereby … (B) grant the Lessee [Aerostar] the right to collect and retain **all fees**, charges and revenues in respect of the LMM Airport Facility, the LMM Airport Facility Assets and the **LMM Airport Facility Contracts**…." (Énfasis nuestro). Ap. pág. 613. Así, de ese contrato (LMM Airport Facility Contracts) se derivan los contratos AP-

08-09-4-110 y AP-08-09-4-136 entre la Autoridad de Puertos y los suplidores de combustible en el Aeropuerto Internacional. Ap., pág. 738.

Por lo tanto, tras una lectura del *Lease Agreement* es forzoso concluir que la Autoridad de los Puertos cedió a Aerostar el cobro del derecho del *fuel fee*. El lenguaje del contrato es claro al respecto.

III

Atendido el primer error, nos corresponde resolver si con la aprobación de la Ley Núm. 206-2014, se menoscabó el acuerdo entre la Autoridad de los Puertos y Aerostar.

La Constitución de Puerto Rico prohíbe la aprobación de leyes que "menoscaben las obligaciones contractuales". Art. II, Sec. 7, Const. PR, LPRA, Tomo 1. De igual forma la Constitución federal contiene una cláusula análoga a los efectos de prohibir que los estados promulguen leyes que menoscaben las obligaciones contractuales. Art.1, Sec. 10, Const. E.E. U.U., LPRA, Tomo 1.

La cláusula contra el menoscabo de obligaciones "limita el poder del Estado para interferir tanto con la contratación privada como la suya propia. AMPR et als. v. Sist. Retiro Maestros V, 190 DPR 854, 868 (2014); Domínguez Castro et al. v. ELA I, 178 DPR 1, 80 (2010), cert. denegado, Castro v. Puerto Rico, 562 U.S. 836 (2010). Véanse, además: Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 US 400 (1983); U.S. Trust Co. of New York v. New Jersey, 431 US 1 (1977). Su

propósito es "asegurar la estabilidad de las relaciones contractuales". AMPR et als. v. Sist. Retiro Maestros V, supra, pág. 868, citando a Trinidad Hernández et al. v. ELA et al., 188 DPR 828, 834 (2013).

El análisis al amparo de esta cláusula depende de si se modifica un contrato entre partes privadas o uno en que el Estado es parte. AMPR et als. v. Sist. Retiro Maestros V, supra, pág. 869; Domínguez Castro et al. v. E.L.A. I, supra, pág. 80. En el caso de que el menoscabo sea entre partes privadas, se aplica un escrutinio de razonabilidad "en el que se toma en cuenta cuán sustancial es el interés público promovido y la extensión del menoscabado contractual". AMPR et als. v. Sist. Retiro Maestros V, supra, pág. 869. Véanse, además, Domínguez Castro et al. v. E.L.A. I, supra, pág. 81; Home Bldg. & Loan Ass'n v. Blaisdell, 290 US 398 (1934). Ahora bien, cuando una de las partes sea el Gobierno, se aplica un escrutinio más cuidadoso "en vista de que el Estado, por ser parte en el contrato, podría actuar para beneficio propio". AMPR et als. v. Sist. Retiro Maestros V, supra, pág. 869; Domínguez Castro et al. v. E.L.A. I, supra, pág. 81; Bayrón Toro v. Serra, 119 DPR 605, 620 (1987).

Por lo tanto, el menoscabo contractual, "además de ser razonable, debe ser necesari[o] para adelantar un propósito gubernamental importante". AMPR et als. v. Sist. Retiro Maestros V, supra, pág. 869, citando a Trinidad Hernández et al. v. ELA et al., supra, pág. 835. Hemos

indicado que "debemos dar deferencia a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad de la medida". Domínguez Castro et al. v. E.L.A. I, supra, pág. 85. En el ejercicio de esa tarea, "es relevante, y aporta a la determinación final de la razonabilidad de la medida, el hecho de que la legislación sea en respuesta a una situación de emergencia y que su aplicación sea temporal o transitoria". Íd., pág. 85 citando a Home Bldg. & Loan Ass'n v. Blaisdell, supra, pág. 447.

Ahora bien, hemos expresado que nuestra función como últimos intérpretes de la ley está limitada por la doctrina de autolimitación judicial. Senado de PR v. ELA, 203 DPR 62, 86 (2019); E.L.A. v. Aguayo, 80 DPR 552, 595 (1958). "La doctrina de autolimitación judicial aplica en aquellas situaciones en las que un tribunal es llamado a evaluar la validez constitucional de una pieza legislativa". Brau, Linares v. ELA et als., 190 DPR 315, 337 (2014).

Las leyes se presumen constitucionales hasta tanto un tribunal declare lo contrario. Íd. pág. 337. Véase, además: Senado de PR v. ELA, supra, pág. 83. Por ello, cuando se cuestiona la validez de una ley o se arrojan dudas sobre su constitucionalidad, primero debemos determinar si hay una interpretación razonable que permita soslayar la cuestión constitucional. Brau, Linares v. ELA et als., supra, pág. 338; E.L.A. v.

Northwestern Selecta, 185 DPR 40, 71 (2012). Así, se propicia que los tribunales se esfuercen por lograr interpretaciones que mantengan la vigencia de las leyes. Íd. De igual forma, "[s]i al adoptarse una interpretación literal y rigurosa del estatuto se plantean interrogantes y objeciones de carácter constitucional, el tribunal atemperará el estatuto, si ello fuere posible". Nadal v. Depto. Rec. Nat., 150 DPR 715, 721 (2000). Hoy seguimos esta norma.

Originalmente, el texto del Art. 1 de la Ley Núm. 82 de 26 de junio de 1959, supra, establecía:

> Por la presente se suspende la imposición y cobro de la contribución que impone el Artículo 30(a) de la Ley Núm. 2, aprobada en 20 de enero de 1956, según enmendada, conocida como "Ley de Impuestos Sobre Artículos de Uso y Consumo de Puerto Rico", en lo que se refiere a gasolina de aviación, a todo producto combustible para uso o consumo en la propulsión de vehículos de transportación aérea, y a toda mezcla de gasolina con cualquier producto combustible para uso o consumo en la propulsión de vehículos de transportación aérea, destinado a consumirse en viajes por aire entre Puerto Rico y otros lugares, o en viajes por aire dentro de los límites territoriales de Puerto Rico, siempre que la Autoridad de los Puertos imponga un derecho de dos centavos por cada galón o fracción de galón sobre dichos productos en lugar de dicha contribución y lo cobre a los suplidores del mismo que operen en los aeropuertos de Puerto Rico. El término "suplidor" significa para los efectos de esta ley cualquier persona natural o jurídica que se dedique al negocio de suplir los arriba mencionados productos, como también significará los consumidores de los referidos productos en el caso de que éstos los importen directamente. Art. 1, Ley Núm. 82 de 26 de junio de 1959, 13 LPRA sec. 4030.

Posteriormente, las disposiciones de la Ley Núm. 82 del 26 de junio de 1959, <u>supra</u>, fueron integradas a la Sección 3020.06 del Código de Rentas Internas de Puerto Rico de 2011, 13 LPRA sec. 31626. En lo pertinente estas disponían:

> (a) Se impondrá, cobrará y pagará el arbitrio que a continuación se indica sobre cada galón o fracción de galón de los siguientes combustibles:
>
> (1) Gasolina 16¢
>
> (2) Combustible de Aviación 3¢
>
> (3) "Gas oil" o "diesel oil" o 4¢
>
> (4) Cualquier otro combustible 8¢
>
> …
>
> (g) De conformidad con la Ley Núm. 82 de 26 de junio de 1959, según enmendada, se suspenderá la imposición y cobro del arbitrio sobre gasolina fijado en el inciso (a)(1) de esta sección cuando se trate de gasolina de aviación y de cualquier otro producto combustible para uso o consumo en la propulsión de vehículos de transportación aérea que sea destinado a consumirse en viajes por aire entre Puerto Rico y otros lugares, o en viajes por aire dentro de los límites territoriales de Puerto Rico, siempre y cuando, en lugar del impuesto fijado en esta sección, la Autoridad de los Puertos imponga sobre dichos productos un derecho de dos (2) centavos por galón o por fracción de galón y lo cobre **a los suplidores que operen en los aeropuertos de Puerto Rico.** (Énfasis nuestro). Código de Rentas Internas de Puerto Rico de 2011, 13 LPRA sec. 31626, ed. 2012, pág. 807.

Ahora bien, ante la dificultad por parte de la Autoridad de los Puertos para recaudar el *fuel fee,* la Asamblea Legislativa aprobó la Ley Núm. 206-2014, con el fin de transferir la responsabilidad del pago del *fuel fee*

a los importadores en lugar de los suplidores. El legislador entendió que este cambio "no solo facilitará la labor de la Autoridad de los Puertos, sino que también aumentará la captación del referido derecho…". Exposición de Motivos, Ley Núm. 206-2014.

Además de este cambio, el legislador incluyó un párrafo a los efectos de disponer que el **importador** "deberá pagar a la Autoridad de los Puertos el derecho [de dos centavos] antes de tomar posesión de los productos mencionados en el párrafo anterior". Sec. 3020.06(g), supra. Es precisamente por este cambio que Aerostar impugnó la constitucionalidad de la Ley Núm. 206-2014, tras entender que menoscaba su acuerdo con la Autoridad de los Puertos.

Una interpretación literal del párrafo citado nos llevaría a concluir que cuando el legislador incluyó que el importador le pagaría el *fuel fee* a la Autoridad de los Puertos se menoscabó sustancial y severamente el contrato de cesión entre la Autoridad y Aerostar. Eliminar de un porrazo una cesión de aproximadamente $40,000,000 sin justificación alguna es, sin lugar a duda, un menoscabo sustancial y severo, más aún, cuando de la Exposición de Motivos de la Ley Núm. 206-2014, no se concluye que el menoscabo es necesario "para adelantar un propósito gubernamental importante". Bayrón Toro v. Serra, supra, pág. 620.

No obstante, el alcance de la enmienda no es ese. Así lo explicó la Asamblea Legislativa:

> La Ley Núm. 82 de 26 de junio de 1959, según enmendada, tenía la intención de suspender la imposición y cobro de la contribución que imponía la Ley Núm. 2 aprobada en 20 de enero de 1956, según enmendada, conocida por "Ley de Impuestos sobre Artículos de Uso y Consumo de Puerto Rico", y autorizar a la Autoridad de Puertos de Puerto Rico a imponer y cobrar un derecho sobre todo combustible de aviación en su lugar. Dicha Ley Núm. 82 estableció que el derecho sería cobrado a los suplidores del combustible de aviación que operaran en los aeropuertos de Puerto Rico, para facilitar la fiscalización a la Autoridad. Actualmente dicho asunto está regulado por la Ley [Núm.]1-2011, según enmendada, conocida como "Código de Rentas Internas para un Nuevo Puerto Rico".
>
> Con el paso del tiempo, la introducción y distribución de combustible en Puerto Rico se ha diversificado, y las funciones de suplidor e importador que antes eran generalmente llevadas a cabo por los mismos entes, hoy son efectuadas por entes distintos. De otro lado, se hace indispensable atemperar a nuestra realidad la cantidad a ser cobrada a todo producto combustible para uso o consumo en la propulsión de vehículos de transportación aérea, y a toda mezcla de gasolina con cualquier producto combustible para uso y consumo en la propulsión de vehículos de transportación aérea.
>
> Por lo tanto, esta Asamblea Legislativa entiende preciso enmendar la Ley [Núm. 1], supra, para aclarar que el responsable del pago del derecho a la Autoridad es el importador, y atemperar el cobro de dicho impuesto a nuestra realidad fiscal. Exposición de Motivos, Ley Núm. 206-2014.

Cuando estudiamos el texto en disputa en cumplimiento con la norma de autolimitación judicial, vemos que existe una interpretación de la Ley Núm. 206-2014, que soslaya el asunto constitucional.

Desde la aprobación de la Ley Núm. 82 de 1959, supra, la instrumentalidad que cobra el derecho de dos centavos es la Autoridad de los Puertos. Esso Standard Oil v. A.P.P.R., supra, pág. 777. Esta realidad no cambió con la aprobación de las enmiendas contenidas en la Ley Núm. 206-2014. Lo único que hizo el legislador fue añadir en el inciso (g) de la Sec. 3020.06 del Código de Rentas Internas, supra, que el pago del fuel fee se debía remitir a la Autoridad de los Puertos. No dispuso nada que no ocurría antes. Por lo tanto, la interpretación de que la aprobación de la Ley Núm. 206-2014, tuvo el propósito de menoscabar la obligación contractual entre las partes aquí en disputa es incorrecta.

En realidad, el único cambio de la Ley Núm. 206-2014, fue disponer que corresponde a los **importadores** pagar el fuel fee. Este cambio tampoco menoscabó el contrato de cesión entre la Autoridad y Aerostar pues la cesión del cobro queda intacta. Lo único que cambia es la entidad a quien le corresponde pagar el fuel fee. Por lo tanto, lo que procede es que, conforme el Lease Agreement los importadores paguen a Aerostar el fuel fee por el combustible a utilizarse en las facilidades del Aeropuerto Internacional. Respecto a los demás Aeropuertos Regionales bajo la administración de la Autoridad de los Puertos, los importadores le remitirán el pago correspondiente al fuel fee de esas facilidades a esa entidad gubernamental.

Recordemos que "de existir dos posibles interpretaciones o construcciones de un texto jurídico, y una de estas implica serios problemas constitucionales, debe[mos] [optar] por la interpretación o la construcción que evita esta tensión, siempre y cuando esta sea mínimamente razonable y caiga dentro de los parámetros permitidos por el texto". J. Farinacci Fernós, Hermenéutica Puertorriqueña: Cánones de interpretación jurídica, San Juan, Ed. InterJuris, 2020, pág. 246. Por lo tanto, ante una alternativa que salve la constitucionalidad del texto, es inmeritorio si la Asamblea Legislativa "escogió la alternativa problemática", pues se busca proteger a esta de "sus instintos inconstitucionales, y se establece una ficción jurídica de que, en verdad, aquella optó por la otra alternativa, pues no sería razonable pensar que esta actuó intencionalmente de forma inconstitucional". Íd.

La interpretación que adoptamos hoy sostiene la constitucionalidad de una medida legislativa y, al mismo tiempo mantiene inalterados los compromisos del gobierno con los inversionistas, para protección del interés público y la inversión en nuestra economía.

IV

Por los fundamentos antes expuestos, se modifica el dictamen del Tribunal de Apelaciones. Corresponde a los importadores del combustible que se utilice para el consumo de la propulsión de vehículos de trasportación

aérea en el Aeropuerto Internacional, pagar a Aerostar el correspondiente derecho de dos ($0.02) centavos por galón o por fracción de galón.  Con esa modificación, se confirma la Sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Total Petroleum Puerto Rico Corp. | |
| Apelados | |
| v. | |
| Autoridad de los Puertos de Puerto Rico; Aerostar Airport Holding, LLC | AC-2020-0047 |
| Apelantes | |
| PUMA Energy Caribe LLC (PUMA) | |
| Apelados | |
| _____ | |
| Autoridad de los Puertos de Puerto Rico | |
| Apelante | |
| v. | |
| Aerostar Airport Holding, LLC | |
| Apelados | |
| _____ | |
| Total Petroleum Puerto Rico Corp. | |
| Apelados | |
| v. | |
| Autoridad de los Puertos de Puerto Rico | |
| Apelante | |

Aerostar Airport Holding, LLC

Apelados

_____A
utoridad de los Puertos de
Puerto Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

BR Products North America Inc.;
Total Petroleum Puerto Rico
Corp.

Apelados

Total Petroleum Puerto Rico
Corp.

Apelados

v.

Autoridad de los Puertos de
Puerto Rico; Aerostar Airport
Holding, LLC

Apelantes

_____

Autoridad de los Puertos de
Puerto Rico

Apelante

v.

Aerostar Airport Holding, LLC

Apelados

_____

Total Petroleum Puerto Rico
Corp.

              Apelados

                  v.

Autoridad de los Puertos de
Puerto Rico; Aerostar Airport
Holding, LLC

              Apelantes

_____

Autoridad de los Puertos de
Puerto Rico

              Apelante

                  v.

  Aerostar Airport Holding, LLC

              Apelados


                          SENTENCIA


En San Juan, Puerto Rico, a 30 de junio de 2022.

   Por los fundamentos antes expuestos, en la Opinión que
antecede, la cual se hace formar parte de esta Sentencia, se
modifica el dictamen del Tribunal de Apelaciones.
Corresponde a los importadores del combustible que se
utilice para el consumo de la propulsión de vehículos de
trasportación aérea en el Aeropuerto Internacional, pagar a
Aerostar el correspondiente derecho de dos ($0.02) centavos
por galón o por fracción de galón. Con esa modificación, se
confirma la Sentencia del Tribunal de Apelaciones.

      Lo acordó el Tribunal y certifica el Secretario del
Tribunal Supremo. El Juez Asociado señor Colón Pérez emitió
una opinión disidente a la cual se unió el Juez Asociado
señor Estrella Martínez. La Jueza Presidenta Oronoz
Rodríguez no intervino.


                    Javier O. Sepúlveda Rodríguez
                  Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Total Petroleum Puerto Rico Corp.

    Apelados

        v.

Autoridad de los Puertos de Puerto
Rico; Aerostar Airport Holding, LLC

    Apelantes

PUMA Energy Caribe LLC (PUMA)

    Apelados

_____

Autoridad de los Puertos de Puerto
Rico

    Apelante

        v.

Aerostar Airport Holding, LLC

    Apelados

                  AC-2020-47

_____

Total Petroleum Puerto Rico Corp.

    Apelados

        v.

Autoridad de los Puertos de Puerto
Rico

    Apelante

Aerostar Airport Holding, LLC

    Apelados

_____

Autoridad de los Puertos de Puerto
Rico

    Apelante

        v.

Aerostar Airport Holding, LLC

    Apelados

BR Products North America Inc.;
Total Petroleum Puerto Rico Corp.

    Apelados

Total Petroleum Puerto Rico Corp.

   Apelados

      v.

Autoridad de los Puertos de Puerto
Rico; Aerostar Airport Holding, LLC

   Apelantes
_____

Autoridad de los Puertos de Puerto
Rico

   Apelante

      v.

Aerostar Airport Holding, LLC

   Apelados
_____

Total Petroleum Puerto Rico Corp.

   Apelados

      v.

Autoridad de los Puertos de Puerto
Rico; Aerostar Airport Holding, LLC

   Apelantes
_____

Autoridad de los Puertos de Puerto
Rico

   Apelante

      v.

Aerostar Airport Holding, LLC

   Apelados

Opinión Disidente emitida por el Juez Asociado señor COLÓN
PÉREZ a la cual se une el Juez Asociado señor ESTRELLA
MARTÍNEZ.

En San Juan, Puerto Rico, a 30 de junio de 2022.

En esta ocasión nos correspondía determinar si el
Tribunal de Apelaciones erró al concluir que la facultad

de cobrar cierto derecho de dos centavos ($0.02) por galón de combustible de aviación, establecida en la Ley Núm. 82 de 26 de junio de 1959, *infra*, y el Código de Rentas Internas de Puerto Rico, *infra*, fue cedida válidamente por la Autoridad de los Puertos de Puerto Rico a Aerostar Airport Holdings, LLC, como consecuencia de la otorgación del *Luis Muñoz Marín International Airport Lease Agreement*. **Asimismo, debíamos precisar si el foro apelativo intermedio erró al dictaminar que la aprobación de la Ley Núm. 206-2014, *infra*, -- relacionada al pago del derecho de dos centavos ($0.02) antes descrito -- infringió el Art. II, Sec. 7, de la Constitución del Estado Libre Asociado de Puerto Rico, por constituir un menoscabo de las obligaciones contractuales formadas entre la Autoridad de los Puertos de Puerto Rico y Aerostar Airport Holdings, LLC.**

Luego de un detenido y cuidadoso análisis de los hechos ante nuestra consideración, así como del derecho aplicable, -- y similar a como una mayoría de este Tribunal resuelve en el día de hoy -- somos de la opinión que el Tribunal de Apelaciones actuó correctamente al concluir que la facultad de cobrar el derecho de dos centavos ($0.02) fue cedida válidamente por la Autoridad de los Puertos a Aerostar Airport Holdings, LLC, en virtud del contrato antes mencionado.

Ahora bien, -- contrario a la intimado por la mayoría de esta Curia --, nos encontrábamos ante uno de esos

escenarios en donde, por excepción, debíamos haber ido un paso más allá y evaluar si la aprobación de la mencionada Ley Núm. 206-2014, *infra*, constituyó un menoscabo de las obligaciones contractuales habidas entre la Autoridad de los Puertos de Puerto Rico y Aerostar Airport Holdings, LLC, según contemplado en el Art. II, Sec. 7, de nuestra Carta Magna, *infra*. De haber realizado dicho análisis, en el caso de autos, era forzado concluir que Aerostar Airport Holdings, LLC, no presentó prueba suficiente para superar el estándar requerido en este tipo de caso. Por ello, hubiéramos revocado parcialmente la *Sentencia* emitida por el foro apelativo intermedio. Veamos.

I.

Los hechos medulares que dieron origen a la causa de epígrafe no están en controversia. Allá para el 27 de febrero de 2014, Total Petroleum Puerto Rico, Corp. (en adelante, "Total") incoó una **Demanda para obligar a reclamantes adversos a litigar entre sí ("interpleader") y sentencia declaratoria**, en contra de Aerostar Airport Holdings, LLC. (en adelante, "Aerostar") y la Autoridad de los Puertos de Puerto Rico (en adelante, "Autoridad").[1] En su escrito, Total sostuvo que el 6 de octubre de 2008, el entonces Esso Standard Oil Company (Puerto Rico), Inc. (en adelante, "Esso") suscribió un acuerdo -- intitulado **Fuel System Agreement and Lease** -- con la Autoridad, en virtud

---

[1] A éste caso le fue asignado el alfanumérico **KAC2014-0148.**

del cual la referida compañía se convirtió en arrendataria y operadora de un sector del sistema de almacenamiento y distribución de combustible ubicado en el Aeropuerto bajo dicho acuerdo, Esso estaba obligado a pagar a la Autoridad cierto derecho -- comúnmente llamado *fuel fee* -- de dos centavos ($0.02) por cada galón de combustible de avión que entregara en el Aeropuerto. Ello, conforme a lo dispuesto en la Sección 3020.06 del Código de Rentas Internas de Puerto Rico, *infra*.

Así, también indicó que posteriormente Esso y Total suscribieron un acuerdo de compra y, como consecuencia, esta última se convirtió en sucesora de la primera. De esta forma, Total adquirió los derechos sobre el acuerdo de arrendamiento entre Esso y la Autoridad.

Total relató, además, que el 24 de julio de 2012 la Autoridad y Aerostar Airport Holdings, LLC (en adelante, "Aerostar") otorgaron un acuerdo, conocido como el ***Luis Muñoz Marín International Airport Lease Agreement*** (en adelante, "*Lease Agreement*"), mediante el cual ésta última se convirtió en arrendataria y operadora del Aeropuerto. En lo pertinente a la controversia ante nos, la **Sección 7.1 del *Lease Agreement*** establecía que:

> The Lessee [Aerostar] shall, at all times during the Term, have the right to establish, collect, retain and enforce payment of all fees, rents, tariffs, revenues and any other type of charge for use of or in connection with the LMM Airport Facility to the fullest extent permitted by Section 10(c) of the Act, subject to all applicable requirements of Law and the terms

and conditions of any applicable use agreement or Assigned LLM Airport Facility Contract. Véase, Apéndice, pág. 854.

En esa dirección, la **Sección 2.1(a)(ii)(B) del *Lease Agreement*** disponía que:

> Upon the terms and subject to the conditions of this Agreement, effective at the time of closing, […] grant the Lessee the right to collect and retain all fees, charges and revenues in respect to the LMM Airport Facility, the LMM Airport Facility Assets and the LMM Airport Facility Contracts, including PFCs and Government Grant-in-Aid[…]. Véase, Apéndice, pág. 807.

Posteriormente, el 27 de febrero de 2013 para ser específicos, la Autoridad suscribió un acuerdo adicional con Aerostar, intitulado ***Assignment and Assumption Agreement***, mediante el cual cedió numerosos contratos a la referida corporación, incluyendo el *Fuel System Agreement and Lease* suscrito por Esso (antecesor de Total) y la Autoridad.[2]

---

[2] En lo referente a la presente controversia, el *Fuel System Agreement and Lease* disponía que:

> a. Lessee agrees to pay Lessor throughout the duration of this contract a Basic Rent for the exercise of the rights, easements and use of the premises granted to Lessee under this agreement, as of the Effective Date of this contract said Basic Rent will be $240,000.00 per year, to be paid in monthly installments of $20,000.00, or System Rent, set forth in Section 1 of this paragraph a whichever amount is greater.
>
> **1. SYSTEM RENT**
>
> Commencing on the Effective Date Lessee agrees to pay on a monthly basis, a System Rent of $0.0225 per gallon for every gallon of Aviation Fuel and Ground Fuel Delivered by the Lessee, or the Basic Rent set forth in Article 6, whichever is greater.

A raíz de estos acontecimientos, y ante cierta misiva
intitulada *Notice of Assignment* enviada por la Autoridad
el 28 de febrero de 2013, Total comenzó a pagar a Aerostar
las partidas correspondientes, incluyendo el *fuel fee* de
dos centavos ($0.02) por cada galón de combustible.[3]
Empero, Total adujo que el 25 de noviembre de 2013 la
Autoridad le envió una segunda comunicación, esta vez
indicándole que debía: 1) remitir el mencionado *fuel fee*

---

2. **PER GALLON FEE**

> Per Act No. 82 of the Legislature of Puerto Rico
> approved June 26, 1959, as amended, Lessee
> agrees to collect on behalf of Lessor and pay
> to Lessor at the end of each month a fee in the
> amount of $0.02 per gallon, for every gallon of
> Aviation Fuel and Ground Fuel, delivered by the
> Lessee, or such other substitute fee that Lessee
> is required by Law to collect and pay to the
> Lessor. In accordance with the provisions of
> Act No. 82 of the Legislature of Puerto Rico
> approved June 26, 1959, however, the fee of
> $0.02 per gallon under this Article is in lieu
> of the tax provided under Section 2009 of Act
> No. 117 approved July 4, 2006, as may be amended
> from time to time, and said fee shall remain in
> force and effect so long as the imposition and
> collection of the tax under said Section 2009
> of Act No. 117 remains suspended. Said fee,
> along with a tax report of Aviation Fuels under
> Lessee's control stored at the San Juan Bay Port
> area will be due and payable by the 15th of the
> following month at Lessor's Finance Department.
> Véase, *Apéndice*, pág. 419.

[3] En dicha carta se detalló que:

> You are hereby notified that, pursuant to the
> provisions of the Luis Muñoz Marín International
> Airport Lease Agreement, dated July 24, 2012, by and
> between the Puerto Rico Ports Authority ("PRPA") and
> Aerostar Airport Holdings, LLC ("Aerostar"), the PRPA
> and Aerostar have entered into an Assignment and
> Assumption Agreement, dated as of February 27, 2013.
> As a result, the above-referenced agreement (together
> with all rents, issues, profits and any and all other
> payments due or to become due to the PRPA thereunder)
> has been assigned to Aerostar. <u>Any balance due before
> said date, shall be paid to the Puerto Rico Ports
> Authority</u>. (Énfasis en el original). Véase, *Apéndice*,
> pág. 299.

a la Autoridad; 2) devolver a dicha entidad las cantidades pagadas a Aerostar desde febrero de 2013; y 3) desistir de pagar el *fuel fee* a Aerostar.[4]

Al enfrentarse con instrucciones contradictorias en cuanto a quién era el verdadero acreedor del pago del *fuel fee*, Total determinó que -- a partir de 17 de enero de 2014 -- depositaría el pago del *fuel fee* en una cuenta *escrow*, hasta tanto la Autoridad y Aerostar dilucidaran la controversia antes descrita; entiéndase, a quien le correspondía el cobro de los dos centavos ($0.02) por cada galón de combustible. De igual forma, Total optó por presentar la *Demanda para obligar a reclamantes adversos a litigar entre sí ("interpleader") y sentencia*.

En esencia, Total arguyó que en todo momento cumplió con sus obligaciones, según los términos del *Fuel System Agreement and Lease*, pero que las instrucciones contradictorias en torno al pago del *fuel fee* lo colocaban en una posición de indefensión. Por tanto, solicitó que la Autoridad y Aerostar litigaran entre sí, además de que el foro primario emitiera una sentencia declaratoria determinando que Total había cumplido con sus responsabilidades en todo momento.

En respuesta, el 29 de mayo de 2014 Aerostar sometió una *Contestación a Demanda de Interpleader, Reconvención en Cobro de Dinero y Demanda contra Coparte*. En ésta,

---

[4] Asimismo, el 19 de diciembre de 2013 Aerostar le cursó una carta a Total, indicándole que tenía derecho a cobrar el *fuel fee*.

Aerostar adujo que, conforme al *Lease Agreement*, al igual que el *Assignment and Assumption Agreement*, asumió "el *Fuel System Agreement and Lease* de Total a base del cual se le cobra a Total el *[Fuel Fee]* de $0.02 por galón de combustible". En específico, citó la **Sección 7.1 y Sección 2.1(a)(ii)(B) del *Lease Agreement***, antes discutidas.

En virtud de ello, Aerostar le solicitó al foro primario que declarara que ésta tenía el derecho a retener la tarifa de dos centavos ($0.02) por galón de combustible, que ordenara a la Autoridad a pagarle cualquier monto recibido en concepto de la tarifa antes mencionada luego del 27 de febrero de 2013, y que se le ordenara a Total que pagase el cargo de dos centavos ($0.02) por galón de combustible adeudado desde diciembre de 2013. A su vez, y bajo planteamientos similares, Aerostar presentó una reconvención en contra de Total, mediante la cual alegó que procedía una acción en cobro de dinero. Además, instó una demanda contra co-parte en cuanto a la Autoridad.

Por otro lado, y de forma paralela al caso **KAC2014-0148**, el 17 de marzo de 2014 la Autoridad instó una *Demanda* sobre sentencia declaratoria y cobro de dinero, en contra de Aerostar, Total y BP Products North America, Inc. (en adelante, "BP").[5] En su escrito, y en cuanto a Total, la Autoridad sostuvo que -- además de una renta básica -- la referida corporación se había comprometido a pagar dos

---

[5] A dicho caso le fue otorgado el alfanumérico **KAC2014-0225**.

centavos ($0.02) por cada galón de combustible de aviación y combustible terrestre despachado por ésta, conforme con las disposiciones de la Ley Núm. 82 de 26 de junio de 1959, conocida como la *Ley de la Imposición y Cobro de Contribución al Combustible de Aviación, infra*. Sin embargo, alegó que desde marzo de 2013 Total había cesado de emitir pagos a su favor.

En lo pertinente a BP, relató que el 4 de diciembre de 2008 esta última y la Autoridad suscribieron un contrato titulado *Fuel System Agreement and Lease*.[6] Mediante éste, la Autoridad cedió -- al igual que ocurrió con Total -- un sector del sistema de almacenamiento y distribución de combustible del Aeropuerto. Cónsono con lo acordado, -- a juicio de la Autoridad -- le correspondía a BP pagar una renta mensual, además de remitirle a la Autoridad dos centavos ($0.02) por cada galón de combustible de aviación y terrestre despachado en el Aeropuerto. No obstante, a raíz del posterior arrendamiento del Aeropuerto a Aerostar, esta última entidad también asumió el *Fuel System Agreement and Lease* otorgado por BP y la Autoridad.[7] Empero, la Autoridad aseveró que, desde marzo de 2013, BP

---

[6] El contrato de referencia tenía un contenido análogo al otorgado con Total. Siendo ello así, no repetiremos sus cláusulas en el presente escrito. Para más detalles, véase, *Apéndice*, pág. 458.

[7] En cuanto a este particular, la Autoridad aseguró que durante el proceso de licitación con Aerostar siempre se enfatizó que el cobro de los derechos de dos centavos ($0.02) por galón de combustible no formaría parte de la transacción. Véase, *Apéndice*, pág. 120. Asimismo, señalaron que, cuando se envió la *Solicitud Final* a la *Federal Aviation Administration*, la Autoridad hizo constar que los fondos de referencia se utilizarían para subsidiar los aeropuertos regionales de Puerto Rico. *Íd.*

dejó de remitirle el pago de los derechos de dos centavos ($0.02) por galón de combustible, enviándolos en vez a Aerostar. Ello, sostiene la Autoridad, a pesar de que le exigió a BP el pago de las correspondientes cantidades en agosto y noviembre de 2013.

A juicio de la Autoridad, dicho proceder fue errado, toda vez que era la única entidad facultada para cobrar el aludido *fuel fee*. En ese sentido, precisó que la Ley Núm. 82 de 26 de junio de 1959, *infra*, facultó a la Autoridad a cobrar una tarifa de dos centavos ($0.02) por galón de combustible de aviación en sustitución de cierto arbitrio, según dispuesto en la Sección 3020.06 del Código de Rentas Internas, *infra.* Como consecuencia, la Autoridad razonó que -- si dejara de cobrar la tarifa de dos centavos ($0.02) por galón de combustible -- el Departamento de Hacienda tendría que comenzar a recaudar el aludido arbitrio.

Por último, la Autoridad sostuvo que con la aprobación de la Ley Núm. 82 de 26 de junio de 1959, *infra*, la Asamblea Legislativa contempló que los fondos recaudados por medio de las disposiciones allí contenidas, reemplazarían fondos asignados para el presupuesto de dicha entidad gubernamental.

A la luz de todo lo anterior, y apoyándose en la precitada Ley Núm. 82 de 26 de junio de 1959, *infra*, y la Sección 3020.06 del Código de Rentas Internas, *infra*, además de los hechos antes esbozados, la Autoridad le

solicitó al foro primario que emitiera una sentencia declaratoria determinando que dicha entidad era la única autorizada en ley para cobrar los derechos sobre el combustible despachado.[8] A su vez, reclamó el pago de las cantidades presuntamente adeudadas por Total, BP y Aerostar.[9]

Entretanto, el 23 de mayo de 2014 Aerostar presentó una *Contestación a Demanda, Reconvención y Demanda contra co-parte* en el caso **KAC2014-0225.** En esencia, Aerostar reiteró que la "cesión de los contratos de la Autoridad con Total y BP fue realizada sin limitación o restricción alguna". Véase, *Apéndice*, pág. 171. De forma que era Aerostar y no la Autoridad quien estaba facultada para

---

[8] La Autoridad, a su vez, citó la Sección 2.4 del *Airport Use Agreement* otorgado entre la Autoridad, Aerostar y ciertas aerolíneas. Véase, *Apéndice*, pág. 788. El acuerdo de referencia atendía los contornos del uso que podían dar las aerolíneas durante la administración de Aerostar. En específico, la precitada sección lee:

> For the avoidance of doubt, neither a third-party operator or the Lessee (as self-operator or otherwise) may impose charges on the Signatory Airlines related to the fuel farm other than the Flowage Fee contemplated under Section 2.4(c); *provided*, *however*, that to the extent that the portion of the amount of any Flowage Fee that is imposed by the Authority pursuant to statutory authorization for the imposition of a tax or a fee in lieu of a tax is increased as a result of a change in Law, then the amount permitted to be charged hereunder shall be automatically increased by such amount. For the avoidance of doubt, the Lessee may continue to impose and received from the fuel farm operator the concession and rental fees that are currently charged to the fuel farm operator. (Énfasis en el original). *Íd*.

[9] El 7 de mayo de 2014 BP presentó una *Demanda contra Coparte* hacia Aerostar, al igual que una *Contestación a la demanda enmendada*.

cobrar el *fuel fee* de dos centavos ($0.02) por galón de combustible.

Por otro lado, y respecto a los argumentos de la Autoridad sobre su autorización de cobro del *fuel fee*, Aerostar sostuvo que, conforme al Art. 10(c) de la Ley Núm. 29-2009, conocida como la *Ley de Alianzas Público Privadas*, *infra*, y en virtud del *Lease Agreement* y el *Assignment and Assumption Agreement*, la Autoridad efectivamente transfirió a Aerostar la potestad de cobrar el referido *fuel fee*.[10] A juicio de Aerostar, "la cesión de los referidos acuerdo *no* fue condicionada ni limitada de ninguna manera". (Énfasis en el original). Véase, *Apéndice*, pág. 178. Además de su alegación responsiva, Aerostar presentó una reconvención en contra de la Autoridad, junto a una demanda contra co-parte en cobro de dinero contra Total y BP.

En lo pertinente al presente caso, es menester señalar que -- mediante su reconvención -- Aerostar solicitó que el foro primario: 1) declarara que es ésta quien tiene derecho, en virtud del *Lease Agreement* y *Assignment and Assumption Agreement*, a cobrar y retener el *fuel fee* de los dos centavos ($0.02) por galón de combustible, efectivo el 27 de febrero de 2013; 2) que ordenara a la Autoridad a pagar a Aerostar cualquier monto recibido en concepto de *fuel fee* a partir de 27 de febrero de 2013; 3) que se

_____

[10] A esos fines, Aerostar citó las Secciones 2.1(a) y 7.1 del *Lease Agreement*.

declarara que la actuación de la Autoridad -- de intentar mediante cierto reglamento revocar el derecho contractual de Aerostar de cobrar el *fuel fee* -- violentaba los derechos contractuales y constitucionales de dicha corporación; y 4) que ordenara a la Autoridad cesar y desistir de poner en vigor el reglamento de referencia. Véase, *Apéndice*, pág. 181.

Trabada así la controversia, el 18 de julio de 2014 el foro primario ordenó consolidar ambos casos -- a saber, la *Demanda* instada por Total y la *Demanda* paralela presentada por la Autoridad -- bajo el alfanumérico *KAC2014-0148*. **Consolidadas las reclamaciones, Aerostar presentó una *Demanda enmendada contra co-parte en caso consolidado KAC2014-0148*. Ello, a los fines de incluir un reclamo para que el foro primario declarara que la Ley Núm. 206-2014, *infra*, -- aprobada durante el transcurso del presente litigio -- violaba sus derechos constitucionales al palio del Art. II, Sec. 7, de la Constitución del Estado Libre Asociado de Puerto Rico, *infra*, y el *Contracts Clause* del Art. I, Sec. 10, de la Constitución de los Estados Unidos, *infra*, así como la doctrina de separación de poderes.** En la alternativa, solicitaron que el Tribunal de Primera Instancia declarara que la Ley Núm. 206-2014, *infra*, constituía un *adverse action* bajo los términos del *Lease Agreement*, permitiendo

así que Aerostar solicitara a la Autoridad el resarcimiento de los daños o menoscabo de sus derechos contractuales.[11]

Aerostar arguyó que el estatuto de referencia modificaba las disposiciones del Código de Rentas Internas, *infra*, en la medida en que, donde antes se cobraba dos centavos ($0.02) por galón de combustible a los <u>suplidores</u> de combustible de aviación en el Aeropuerto, ahora -- según la Ley Núm. 206-2014, *infra* -- se les impondría dicho pago a los <u>importadores</u>. Pagos que, según la ley de referencia, serían remitidos a la Autoridad. A juicio de Aerostar, la aprobación de la precitada pieza legislativa procuraba compeler el pago del *fuel fee* a la Autoridad, en violación de la jurisdicción del foro primario. A su vez, sostuvieron que el pago del *fuel fee* a la Autoridad -- según fue estatuido en la Ley Núm. 206-2014 -- era contraria a los acuerdos otorgados por esta última y Aerostar.

---

[11] El Art. 14 del *Lease Agreement* traza los contornos de lo que constituye un *adverse action*. Así pues, la Sección 14.1 dictamina que:

> (a) An "<u>Adverse Action</u>" shall occur if the Authority or any other Governmental Authority established under the Laws of the Commonwealth takes action or actions at any time during the Term (including enacting a law) and the effect of such action or actions, individually or in the aggregate, is reasonably expected (i) to be principally borne by the Lessee or private operators of Comparable Public Airports or Contratantes and (ii) to have a material adverse effect on the fair market value of the Lessee interest, except where[…]

> (b) If an Adverse Action occurs, the Lessee shall have the right to receive Leasehold Compensation from the Authority with respect thereto (such Leasehold Compensation, the "AA-Compensation"); *provided, however,* that if the Adverse Action constitutes […]

Luego de numerosos incidentes procesales no necesarios aquí pormenorizar, el 14 de septiembre de 2016 Aerostar radicó una *Moción de Sentencia Sumaria* para los casos consolidados.[12] Allí, comenzó señalando que la controversia medular de la causa de epígrafe era a quién le correspondía el derecho a cobrar el cargo de dos centavos ($0.02) por cada galón de combustible que se despacha en el Aeropuerto, según los contratos firmados entre Aerostar y la Autoridad. En cuanto a ello, Aerostar aseveró que las secciones 2.1(a)(ii)(B) y 7.1 del *Lease Agreement*, el *Assignment and Assumption Agreement* y la sección 2.4(c) del *Airport Use Agreement*, disponían textualmente que la entidad de referencia tenía el derecho a cobrar el aludido *fuel fee*. Debido a ello -- y por entender que, conforme a la doctrina sobre interpretación contractual que establece que si los términos de un acuerdo son claros, se acoge el sentido literal de sus cláusulas -- razonó que era forzoso concluir que se había cedido dicha facultad.

En segundo plano, Aerostar arguyó que la Autoridad estaba impedida por sus propios actos y, como consecuencia, estaba vedada de reclamar el derecho de cobro del *fuel fee*.

Finalmente, Aerostar afirmó que tanto la Ley Núm. 206-2014, *infra*, como cierto reglamento para el aparente

---

[12] El 4 de noviembre de 2016 la Autoridad sometió una *Oposición a Moción de Sentencia Sumaria de Aerostar Airport Holdings, LLC*.

cobro del *fuel fee*, eran inconstitucionales. Sostuvo que la Ley Núm. 82 de 26 de junio de 1959, *infra*, autorizó a la Autoridad a imponer y cobrar un *fuel fee*, el cual no representaba un impuesto, sino un cargo o tarifa. Por consiguiente, el mismo se ubicaba dentro de la categoría de cargos y tarifas las cuales podían ser cobradas por Aerostar, en virtud de la cesión hecha por la Autoridad.

No obstante, Aerostar sostuvo que, una vez sometida la controversia a la consideración del Tribunal de Primera Instancia, se aprobó la Ley Núm. 206-2014, *infra*, mediante la cual se enmendó el Código de Rentas Internas, *infra*, a los fines de que los importadores de combustible pagaran el *fuel fee* de dos centavos ($0.02) exclusivamente a la Autoridad. Es decir, se disponía un pago contrario al acordado entre Aerostar y la Autoridad.

Asimismo, indicó que, durante la celebración de los procesos judiciales, habían advenido en conocimiento que la Autoridad había publicado un aviso sobre un propuesto *Reglamento para el cobro del derecho por galón sobre gasolina a los suplidores que operen en aeropuertos de Puerto Rico.*[13] Según dicha entidad, el único propósito del reglamento de referencia era establecer que el pago del *fuel fee* debía remitirse directamente a la Autoridad. Ello, según Aerostar, era un proceder inconstitucional, ya que

---

[13] Dicho reglamento sería aprobado con el título *Reglamento para el cobro del derecho por galón sobre combustible de aviación*, *infra*.

representaba el menoscabo de los derechos contractuales de la entidad de referencia, al igual que una violación a la doctrina de separación de poderes, al afectar la jurisdicción del tribunal.[14]

Por su parte, el 3 de noviembre de 2016 BP también presentó una *Moción de Sentencia Sumaria*. En apretada síntesis, BP indicó que desde diciembre de 2008 -- cuando originalmente otorgó cierto *Fuel System Agreement and Lease* junto a la Autoridad --, había sufragado de forma consistente e ininterrumpida los pagos de arrendamiento y el *fuel fee* de dos centavos ($0.02) por galón de combustible los cuales estaba obligado a efectuar. En ese sentido, precisó que la acción ante el foro primario se limitaba a dilucidar quién tenía el derecho de cobrar el *fuel fee*, haciendo su presencia innecesaria. Ello, ya que -- según éste -- en todo momento cumplió con sus obligaciones contractuales.[15]

A su vez, aseguró que, luego de mayo de 2014, y ante la controversia sobre a quién le correspondía el pago del

---

[14] Cabe señalar que Aerostar enfatizó que "resulta evidente que el único y verdadero propósito de la Ley 206-2014 es compeler el pago a favor de la Autoridad de Puertos, y no a Aerostar, del Fuel Fee que está en controversia en este caso". Véase, *Apéndice*, pág. 404. Similar argumento hizo sobre el *Reglamento* propuesto. *Íd*.

De otra parte, es menester señalar que el **31 de octubre de 2016** la Autoridad presentó una ***Oposición a Moción de sentencia sumaria de Aerostar Airport Holdings, LLC***. Véase, *Apéndice*, pág. 887.

[15] A fines de plasmar la naturaleza de la controversia, enumeró las distintas comunicaciones recibidas de parte de la Autoridad y Aerostar, en donde expresaban instrucciones contradictorias en cuanto al pago del *fuel fee*. Véase, *Apéndice*, págs. 927-930.

*fuel fee*, consignó el correspondiente dinero en el tribunal, hasta la resolución final de la acción judicial. De forma que, contrario a lo expresado por Aerostar y la Autoridad, no existía deuda alguna. Máxime cuando, de haber alguna deuda por algún cobro de lo indebido por periodos anteriores, no le correspondería a BP resarcir dicho dinero. A la luz de todo ello, BP solicitó que el foro primario dispusiera sumariamente de todas las reclamaciones instadas en su contra y, como consecuencia, éstas fueran desestimadas con perjuicio.

Así las cosas, el 4 de noviembre de 2016 Total, por igual, presentó una moción para que se dictase sentencia sumaria. De forma similar, ésta última solicitó que el foro primario dictara sentencia sumaria sobre ambas causas de acción, es decir: 1) que resolviera que procedía que la Autoridad y Aerostar litigaran entre sí al palio de la Regla 19 de Procedimiento Civil, *infra*; y 2) que, de acuerdo con la Regla 59.1 de Procedimiento Civil, *infra*, se dictara sentencia declaratoria decretando que Total había cumplido con sus obligaciones, según los términos contractuales.

Cónsono con ello, Total arguyó que había cumplido con sus obligaciones contractuales a la luz del *Fuel System Agreement and Lease*, por lo que -- a su juicio -- radicar la demanda de *interpleader* era su única alternativa. Ello, ya que -- a pesar de haber sido informado mediante el *Notice of Assignment* que debía remitir sus pagos a Aerostar

-- tanto la mencionada corporación como la Autoridad estaban exigiendo el pago del *fuel fee*. A esos fines, enfatizaron que trataron "sin éxito, que la Autoridad y Aerostar se pusieran de acuerdo para [resolver]" la controversia. Véase, *Apéndice*, pág. 1027.

Por otro lado, Total arguyó a favor de la aplicación de la doctrina de actos propios en cuanto a la Autoridad. En ese sentido, precisaron que el *Notice of Assignment* emitido por la Autoridad -- donde informan el *Assignment and Assumption Agreement* otorgado por la Autoridad y Aerostar -- "no limitó de forma alguna el amplio alcance de esta cesión y que la expresión no genera dudas de que lo que se esperaba de [Total] era que todos los pagos futuros se le harían de forma prospectiva a Aerostar". Véase, *Apéndice*, pág. 1029.[16] Siendo ello así, Total sostuvo que la Autoridad estaba impedida de actuar en contra de sus propios actos y, como consecuencia, no podía reclamar que Total respondiera por los pagos hechos a Aerostar entre febrero y noviembre de 2013.[17] Por último,

---

[16] Al igual que en la carta dirigida a BP, el *Notice of Assignment* enviado a Total indicaba que:

> As a result, the above-referenced agreement (together with all rents, issues, profits and any and all other payments due or to become due to the PRPA thereunder) has been assigned to Aerostar. <u>Any balance due before said date, shall be paid to the Puerto Ports Authority</u>. (Énfasis en el original) Véase, *Apéndice*, pág. 1034.

[17] Es menester recordar que a partir del 17 de enero de 2014 Total hizo los correspondientes pagos del *fuel fee* a una cuenta de *escrow*. Ello, en lo que se resolvía la controversia sobre la facultad de cobrar el derecho de referencia.

Total reiteró que si el Tribunal de Primera Instancia determinase que le correspondían los pagos del *fuel fee* a la Autoridad, no respondería, toda vez que aplicaría la doctrina del cobro de lo indebido.

De forma similar, el 7 de noviembre de 2016 la Autoridad presentó su propia *Moción de Sentencia Sumaria*. En lo pertinente, cabe reseñar que la Autoridad, en los hechos que enumeró como incontrovertidos, le dio particular énfasis al hecho de que, en junio de 2012 el equipo consultor de Aerostar envió al grupo consultor de la Autoridad para las Alianzas Público Privadas (en adelante, "AAPP") cierta pregunta relacionada a la facultad de ceder el derecho a cobrar el *fuel fee* de dos centavos ($0.02) por galón de combustible. Ante dicha interrogante, la AAPP le indicó a los consultores de Aerostar que para hacer la cesión del cobro del referido *fuel fee* se necesitaba acción de parte de la Asamblea Legislativa.[18]

---

[18] En particular, el intercambio al cual se hizo referencia lee de la siguiente manera:

> **Alexander Greenbaum,** *Leading Infrastructure Office* **de UBS (entidad consultora para Aerostar):** Two confidential RFCs [Request for Clarification] from the Highstar/ASUR team: 1. Please confirm whether the fuel surcharge funds currently collected by the PRPA are collected (i) on behalf of the Puerto Rico General Fund or (ii) for the benefit of the PRPA.
>
> **James Flaherty (consultor de la AAPP):** ASUR/Highstar team, Thank you for the RFCs. These are both addressed through the letter posted at 04.04.0.02 from counsel to PRPA. Please refer to that as answer to your confidential RFCs. Thanks, Jimmy.
>
> **Brent Tasugi:** Jimmy - Thanks. We've reviewed the letter and the way it reads is the following: That

De otra parte, la Autoridad indicó que, cuando ésta y Aerostar sometieron su *Final Application* ante la Administración Federal de Aviación para que aprobara el proyecto de alianza, expresaron que la Autoridad utilizaría los fondos del *fuel fee* para el mantenimiento de los distintos aeropuertos regionales en Puerto Rico. Véase, *Apéndice*, pág. 1052.[19]

Dicho ello, la Autoridad procedió a exponer varios argumentos legales en apoyo de su solicitud. A esos fines, comenzó arguyendo que es la única entidad facultada por la Ley Núm. 82 de 26 de junio de 1959, *infra*, para cobrar el *fuel fee* de dos centavos ($0.02) por galón de combustible.

---

the $0.02 tax is considered 'General Fund' revenues, but due to the effect of Law 82, the PRPA, a government entity, is allowed to collect and use this tax for their benefit. In order to transfer the right to a private operator, new legislation would need to be passed. If you could please confirm with Greenberg Tauring that that is the correct interpretation, we'd appreciate it.

**James Flaherty (consultor de la AAPP):** From Greenberg: 'PRPA is specifically authorized to collect the fuel surcharge under Law 82. So long as the fuel surcharge is being imposed, the Commonwealth has suspended the applicable aviation fuel tax provisions under the PR tax code. This suspension was first instituted in 1959 when PRPA was authorized to impose the fuel surcharge and has been continued into the tax code. The fuel surcharge is not a tax per se, but it effectively substituted the tax. If PRPA stopped imposing the surcharge, the Commonwealth's tax would become effective and the Commonwealth would collect the tax and apply it as it does other tax revenue.

Our view is that because Law 82 not only allows PRPA to impose the surcharge, but also suspends the Commonwealth's right to impose its taxing power to the benefit of PRPA, PRPA cannot assign its right under Law 82 to impose the surcharge to a private party without additional legislative authorization. Véase, *Apéndice*, pág. 1066.

[19] Asimismo, la Autoridad reiteró su alusión a lo expresado en la Sección 2.4 del *Airport Use Agreement*. Véase, *Apéndice*, pág. 1053.

Según expuso, es en vista del cobro del *fuel fee* por parte de la Autoridad que el Estado suspende el cobro del arbitrio del combustible de aviación despachado en el Aeropuerto. De forma que, si la Autoridad no hace el correspondiente cobro del *fuel fee*, el Departamento de Hacienda efectuaría el cobro del arbitrio correspondiente. En fin, a juicio de la Autoridad, la Ley Núm. 82 de 26 de junio de 1959, *infra*, no contemplaba el cobro del *fuel fee* por una entidad privada ni fue enmendada para disponer lo anterior.

Por otro lado, la Autoridad alegó que, de entender que era posible ceder la facultad de cobrar el *fuel fee* a una entidad privada, ello no ocurrió por la vía contractual en el presente caso. Esto, ya que el lenguaje incluido en el *Airport Use Agreement* dejaba claro que Aerostar sólo estaba autorizado a cobrar los pagos de renta y concesión a las entidades como Total y BP.[20] Asimismo, la Autoridad

---

[20] No obstante, la Autoridad sí señaló, en cuanto a lo dispuesto en el *Airport Use Agreement* y la definición allí utilizada sobre el término *flowage fee* que:

> Obsérvese que, a pesar de que la definición antes citada dispone que es el 'Lessee', es decir, Aerostar quien cobra el 'Flowage Fee' a la fecha del 'Closing', lo cierto es que esto debe obedecer a un error pues a la fecha del cierre de la transacción, era la Autoridad quien operaba el Aeropuerto, y Aerostar no cobraba renta ni cargo alguno relacionado a dicha operación. Véase, *Apéndice*, pág. 1059.

En este contexto, y según esbozado en el contrato antes mencionado, el *flowage fee* es "the system rents and/or per gallon fees charged as of the Closing by the Lessee to the fuel farm operator(s) per gallon of gasoline or jet fuel sold, in consideration of allowing the fuel farm operator(s) to deliver fuel to the Airport". Véase, *Apéndice*, pág. 771.

sostuvo que, de acuerdo con los principios fundamentales de los contratos, una cláusula que cediera a una entidad privada como Aerostar el derecho a cobrar el *fuel fee* no sería válida, por ser contraria a la ley.

De igual forma, la Autoridad indicó que, de entender que los términos del contrato son inciertos, "la evidencia incontrovertida extrínseca al contrato confirma que no ocurrió la transferencia". Véase, *Apéndice*, pág. 1061. Razonó que el equipo consultor de Aerostar discutió la procedencia del cobro del *fuel fee* a la AAPP, además de que informó a la Administración Federal de Aviación que la Autoridad continuaría recibiendo los ingresos del *fuel fee*.

Por último, y en cuanto a la constitucionalidad de la Ley Núm. 206-2014, *infra*, señaló que era necesaria la intervención de Secretario de Justicia en el pleito. Así también, arguyó que -- desde la perspectiva de la cláusula constitucional del menoscabo de obligaciones contractuales -- el estatuto de referencia cambió las entidades obligadas a pagar el *fuel fee*, no así la entidad con derecho a cobrar el mismo. Por lo que, a juicio de la Autoridad, no cabía hablar de un menoscabo de obligaciones contractuales.

Tras evaluar las distintas mociones de sentencia sumaria presentadas por las partes, el 31 de mayo de 2017 el foro primario dictó una **primera *Sentencia Parcial*.**[21] Por

---

[21] Ésta fue notificada el 18 de julio de 2017.

medio de ésta, declaró *ha lugar* la moción de sentencia sumaria presentada por BP y, como consecuencia, desestimó con perjuicio todas las reclamaciones en contra de ésta. El Tribunal de Primera Instancia expresó que, ante el hecho de que tanto la Autoridad como Aerostar pretendieron ante BP tener el derecho de cobrar el *fuel fee*, la consignación era el remedio disponible, acción que fue oportunamente tomada por BP. Tras evaluar las circunstancias y las consignaciones hechas por BP, el foro primario concluyó que las mismas fueron válidas y efectuadas correctamente.

En cuanto a los pagos remitidos por BP a Aerostar y la Autoridad previo a las consignaciones, el foro primario determinó que se constituyeron los requisitos para el pago por cobro de lo indebido. Por consiguiente, sentenció que "le corresponderá a la parte que no tenía derecho a cobrar el cargo por combustible, reembolsarlo al acreedor legítimo". Véase, *Apéndice*, pág. 3277.

De forma similar, el 14 de diciembre de 2017 el Tribunal de Primera Instancia emitió una **segunda *Sentencia Parcial***.[22] Por medio de ésta, declaró *ha lugar* la moción de sentencia sumaria presentada por Total y, por ende, desestimó con perjuicio todas las reclamaciones presentadas en contra de ésta. Ello, expresando fundamentos análogos a los de su *primera Sentencia Parcial* de 31 de mayo de 2017.

---

[22] La misma fue notificada el 19 de diciembre de 2017.

Así las cosas, el 1 de noviembre de 2018 el foro primario emitió una tercera *Sentencia Parcial*, la cual da génesis a la presente controversia. Mediante ésta, el Tribunal de Primera Instancia declaró *no ha lugar* la *Demanda* presentada por la Autoridad y, por otro lado, declaró *ha lugar* -- parcialmente -- la *Reconvención* incoada por Aerostar. En esencia, el Tribunal de Primera Instancia determinó que: 1) Aerostar era la entidad con derecho a cobrar el *fuel fee* de dos centavos ($0.02) por el combustible de aviación que los suplidores introducen en el Aeropuerto; 2) la Ley Núm. 206-2014, *infra*, era constitucional, a pesar de que, a juicio de dicho foro, podría representar un *adverse action*, cuya consecuencia sería una compensación para Aerostar; 3) la Autoridad tenía la facultad de cobrar dos centavos ($0.02) por galón de combustible de aviación a todos los importadores; y 4) que la Autoridad debía devolver todo el dinero recibido por parte de los suplidores en relación al *fuel fee*, por pertenecer a Aerostar en virtud del contrato suscrito. En vista de lo anterior, el foro primario concluyó que sólo restaba adjudicar si la Ley Núm. 206-2014, *infra*, constituía o no un *adverse action*.

Al exponer sus fundamentos para las anteriores determinaciones, el Tribunal de Primera Instancia comenzó señalando que -- a su juicio -- el *fuel fee* no era un impuesto o arbitrio, sino un ingreso del Aeropuerto del cual la Autoridad se beneficiaba en calidad de

administrador. Por lo que, contrario a lo esbozado por la Autoridad, el *fuel fee* podía ser transferido a un ente privado.

Acto seguido, el foro primario determinó que -- a la luz del Art. 10(c) de la Ley de Alianzas Público Privadas, *infra* -- la cesión de la facultad de cobrar el *fuel fee* no era contraria a la ley. Dicho ello, el Tribunal de Primera Instancia prosiguió a analizar si el lenguaje del contrato era claro a esos fines, contestando dicha interrogante en la afirmativa.

Tras hacer el antedicho análisis, el foro primario se concentró entonces en dilucidar si, según alegado, la Ley Núm. 206-2014, *infra*, era inconstitucional, por haber enmendado la ley que faculta el cobro del *fuel fee* de dos centavos ($0.02) por galón de combustible. Sobre el particular, el Tribunal de Primera Instancia en su *Sentencia* enfatizó que la enmienda realizada por medio de la Ley Núm. 206-2014, *infra*, fue un ejercicio legítimo del poder del Estado para enmendar leyes. Ahora bien, tras hacer un estudio de lo expuesto en el estatuto de referencia, el foro primario determinó que ésta no impedía que Aerostar continuase cobrando el mencionado *fuel fee*. Esto, ya que, a juicio del Tribunal de Primera Instancia, la Ley Núm. 206-2014, *infra*, extendió sus efectos a los importadores, donde antes solo decía los suplidores. **En específico, el foro primario indicó que a "Aerostar le corresponden todos los ingresos por *fuel fee* que cobra de**

**los suplidores por el uso de las instalaciones del Aeropuerto. Por otra parte, la Autoridad de los Puertos está facultada, por virtud de la Ley Núm. 206-2014, a cobrarle a los importadores de combustible un derecho de 2 centavos […]".** (Énfasis suplido). Véase, *Apéndice*, pág. 1135.

Inconformes, todas las partes del pleito presentaron sus correspondientes mociones de reconsideración el 11 de diciembre de 2018. Valga mencionar que ésta fue la primera vez en que compareció Puma Energy Caribe, LLC, (en adelante, "PUMA"), mediante una *Moción Solicitando Intervención y en Solicitud de Reconsideración*. Allí, ésta señaló que lo consignado en la *Sentencia parcial* impondría un doble pago, contrario a lo dispuesto por el derecho aplicable. Por esto, solicitó intervenir, toda vez que la determinación de referencia alegadamente le afectaba. Tras evaluar todas las mociones ante su consideración, el 20 de diciembre de 2018 el Tribunal de Primera Instancia emitió una *Resolución* declarando *no ha lugar* a las mismas.

Insatisfechas, el 25 de enero de 2019 todas las partes -- con excepción de BP -- recurrieron ante el Tribunal de Apelaciones, mediante sus correspondientes **recursos de apelación**, aunque aduciendo distintas alegaciones de error. De otra parte, Aerostar -- por estar mayormente conforme con lo dispuesto por el foro primario -- sostuvo que el Tribunal de Primera Instancia había errado al determinar que la Ley Núm. 206-2014, *infra*, y su

correspondiente *Reglamento*, *infra*, eran constitucionales.[23]

En contraste, la Autoridad afirmó que el foro primario erró al concluir que el derecho de la referida agencia gubernamental de cobrar el *fuel fee* nacía de su ley habilitadora y no de la Ley Núm. 82 de 26 de junio de 1959, *infra*.[24] También, sostuvo que el Tribunal de Primera Instancia había errado al determinar que la Autoridad había cedido su facultad de cobrar el *fuel fee* a Aerostar, a pesar de que -- a su modo de ver -- ello no era permitido por la Ley Núm. 82 de 26 de junio de 1959, *infra*, ni por los contratos de las partes. Por último, arguyó que el foro primario había errado al concluir que el *Lease Agreement* y el *Airport Use Agreement* eran claros y no se prestaban a interpretación.

Por otro lado, y en apretada síntesis, PUMA alegó que el foro primario había errado al interpretar que la Ley Núm. 206-2014, *infra*, creaba una nueva fuente de ingresos para la Autoridad, al establecer un derecho adicional sobre el combustible de avión.[25] Del mismo modo, Total formuló una alegación de error análoga a la antes descrita.[26]

Luego de examinar los recursos ante su consideración, el Tribunal de Apelaciones ordenó su consolidación. Asimismo, el 14 de agosto de 2019 celebró una vista oral

---

[23] Asignado el alfanumérico **KLAN2019-00097**.
[24] Asignado el alfanumérico **KLAN2019-00098**.
[25] Asignado el alfanumérico **KLAN2019-00094**.
[26] Asignado el alfanumérico **KLAN2019-00099**.

sobre las controversias bajo estudio. Transcurrido lo anterior, el foro apelativo intermedio emitió una extensa *Sentencia* en la causa de epígrafe.[27]

En primer lugar, el Tribunal de Apelaciones concluyó que sí procedía resolver el presente caso sumariamente, ya que -- a su entender -- no existían controversias de hechos medulares y sólo restaba aplicar un análisis "exclusivamente hermenéutico". Superado el asunto de umbral, el foro apelativo intermedio atendió las alegaciones de error ante su consideración.

A esos fines, y en lo relacionado a los planteamientos de Aerostar, el foro apelativo intermedio comenzó resumiendo los argumentos de dicha corporación, a saber: que la Ley Núm. 206-2014, *infra*, y su correspondiente reglamento eran inconstitucionales por menoscabar ciertos acuerdos contractuales; que dicho estatuto no respondía a un interés gubernamental importante, sino que buscaba impedirle a Aerostar el cobro del *fuel fee* al imponer el pago del mismo a los importadores; y que, en la alternativa, la Ley Núm. 206-2014, *infra*, y su correspondiente reglamento eran contrarios a la doctrina de separación de poderes. A juicio del Tribunal de Apelaciones, Aerostar tenía razón.

Tras hacer una lectura de los contratos en cuestión, junto a la Ley de Alianzas Público Privadas, *infra*, el

---

[27] Emitida el 30 de junio de 2020 y notificada el 31 de julio de 2020.

foro apelativo intermedio sentenció que hubo una transferencia válida del derecho a cobrar y retener el *fuel fee*.[28] Razonó que no podía apartarse del sentido literal del texto final de las cláusulas de los contratos, ni podía perder de vista que la Ley de Alianzas Público Privadas, *infra*, "estipula que sus disposiciones **prevalecerán** sobre las disposiciones de cualquier otro estatuto que pueda estar en pugna con sus propósitos". (Énfasis en el original). Véase, *Apéndice*, pág. 49.

Por otro lado, y en cuanto a la constitucionalidad de la Ley Núm. 206-2014, *infra*, y su reglamento, el Tribunal de Apelaciones subrayó que -- si bien el referido estatuto buscaba aumentar la captación del *fuel fee* -- no tomó en consideración la existencia de los contratos entre la Autoridad y Aerostar. En ese sentido, el foro apelativo intermedio enfatizó el hecho de que la Ley Núm. 206-2014, *infra*, disponía que el pago del *fuel fee* se les impondría a los <u>importadores</u> y que éstos debían hacer el pago a la Autoridad, mientras que el *Lease Agreement* -- firmado antes de la aprobación del estatuto de referencia -- establecía que el pago del *fuel fee* debía ser efectuado por los <u>suplidores</u> a Aerostar.

Así pues, a la luz de lo anterior, concluyó que -- dadas las circunstancias particulares del presente caso

---

[28] El Tribunal de Apelaciones también hizo alusión a la Sección 20.2 del *Lease Agreement*, la cual contiene una cláusula de integración. Ésta dispone que el *Lease Agreement* desplaza cualquier negociación, acuerdo, discusión o entendido entre las partes, formulado <u>antes</u> del contrato final.

-- la Ley Núm. 206-2014, *infra*, representaba un menoscabo severo de las relaciones contractuales, según constituidas por el *Lease Agreement* y el *Assignment and Assumption Agreement*.[29] Máxime, cuando -- según el Tribunal de Apelaciones -- la Asamblea Legislativa "no logró articular la necesidad de que el menoscabo fuese uno razonable para alcanzar un interés gubernamental apremiante". Véase, *Apéndice*, pág. 51.

Al foro apelativo intermedio le preocupó particularmente la posibilidad de que un suplidor -- que también funja como importador -- se vea en el dilema de no saber a quién pagar el *fuel fee*. En consecuencia, el Tribunal de Apelaciones concluyó que tanto la Ley Núm. 2106-2014, *infra*, como su *Reglamento* **eran inconstitucionales**, pues constituían un menoscabo severo de las relaciones contractuales de Aerostar y la Autoridad. Por consiguiente, el tribunal *a quo* sentenció que Aerostar era la entidad con derecho a cobrar el *fuel fee*, de conformidad con el *Lease Agreement* y el *Assignment and Assumption Agreement.*

Establecido lo anterior, el Tribunal de Apelaciones pasó entonces a evaluar los señalamientos de error de la Autoridad. Sobre este extremo, el foro apelativo intermedio señaló que -- contrario a lo expuesto por la

---

[29] El Tribunal de Apelaciones concluyó que "[r]esulta evidente que los 'suplidores' bajo el *Lease Agreement* son los mismos 'importadores' bajo la Ley 206-2014, provocando así que éstos opten por pagarle a la Autoridad aquello que le corresponde a Aerostar, aun cuando rige un contrato válido entre las partes". Véase, *Apéndice*, pág. 51.

Autoridad -- la facultad de cobrar el *fuel fee* no emanaba de la Ley Núm. 82 de 26 de junio de 1959, *infra*, sino de la Ley Orgánica de la Autoridad de los Puertos, 23 LPRA sec. 336. Ello, según evaluado por esta Curia en el caso *Esso Standard Oil v. A.P.P.R.*, 95 DPR 772 (1968). En la alternativa, el Tribunal de Apelaciones sostuvo que la Ley Núm. 82 de 26 de junio de 1959, *infra*, no imponía una tarifa *per se*, sino que suspendía el arbitrio contenido en el Código de Rentas Internas, *infra.*

De otra parte, tras llegar a la anterior conclusión, el foro apelativo intermedio se enfocó en la alegación de que la facultad del cobro del *fuel fee* no podía ser cedida. Dicho foro no quedó persuadido por los argumentos de la Autoridad. Expresó que la Autoridad no mostró reparos a la cesión de dicha facultad. Así, también, señaló que, bajo la interpretación propuesta por la Autoridad, "los contratos otorgados al amparo de la Ley de Alianzas Público Privadas serían ineficaces - al igual que cualquier cesión realizada a tenor con el Art. 10 de la Ley -, pues todos los cargos impuestos por las entidades gubernamentales precisamente existen en virtud de alguna Ley". Véase, *Apéndice*, pág. 54. Del mismo modo, y en cuanto a la interpretación contractual aplicable al caso de epígrafe, el Tribunal de Apelaciones recalcó que, contrario a lo alegado por la Autoridad, no existía necesidad de evaluar

prueba extrínseca, toda vez que el lenguaje del *Lease Agreement* era claro.[30]

Por último, y en lo relacionado a las alegaciones de PUMA, el Tribunal de Apelaciones concluyó que la interpretación del foro primario en torno a la Ley Núm. 206-2014, *infra*, fue inconsistente con el texto del estatuto. Tras examinar el historial legislativo junto al texto de la precitada ley, expresó que coincidía "en que PUMA tenía la obligación de pagar un solo derecho de dos centavos, ya que el esquema de doble tributación erigido por el TPI es inválido". Véase, Apéndice, pág. 44. De este modo, dictaminó que PUMA debería continuar pagándole el *fuel fee* a Aerostar, de la forma que lo efectuaba antes de que la Autoridad interviniera. Este análisis fue el mismo aplicado en el caso de Total.

**Dicho ello, el foro apelativo intermedio revocó la *Sentencia parcial* apelada y, en síntesis, dispuso lo siguiente: 1) el derecho a cobrar y retener el *fuel fee* de dos centavos ($0.02) por galón de combustible fue transferido válidamente a Aerostar por virtud del *Lease Agreement* y según los propósitos de la Ley de Alianzas Público Privadas, *infra*; 2) la Ley Núm. 206-2014, *infra*, y su *Reglamento* son inconstitucionales; 3) Aerostar es la única entidad con derecho a cobrar y retener el aludido**

---

[30] Ello, ante la alegación de la Autoridad que el caso se debía devolver al foro primario para celebración de un juicio en su fondo y así tener la oportunidad de pasar prueba capaz de establecer que nunca existió la intención de ceder la facultad de cobro del *fuel fee*.

***fuel fee*; y 4) PUMA y Total continuarán pagando un cargo único de *fuel fee* a Aerostar, a tono con el *Lease Agreement* y el *Assignment and Assumption Agreement*.**

Insatisfecha, la Autoridad acude ante nos mediante un *Recurso de apelación civil*. De entrada, la Autoridad alega que el Tribunal de Apelaciones erró al desviarse de la letra de la Ley Núm. 82 de 26 de junio de 1959, *infra*, la cual, a su entender, exime el pago del arbitrio sobre el combustible de aviación condicionado a que sea la Autoridad (y no sus sucesores o cesionarios) la entidad que siempre imponga y cobre el derecho personalísimo de $0.02 centavos. Además, sostiene que el foro apelativo intermedio incidió al efectuar una lectura incorrecta de los contratos en controversia y hacer un uso selectivo de cierta prueba extrínseca. Finalmente, la Autoridad arguye que el Tribunal de Apelaciones erró al declarar inconstitucional la Ley Núm. 206-2014, *infra*, cuando Aerostar no tiene derecho contractual para cobrar el *fuel fee*.[31] Es, pues, a

---

[31] De igual forma, sostiene que se invirtió el peso de la prueba en cuanto a la acción de menoscabo de obligaciones contractuales. A modo de ejemplo, alega que -- contrario a lo sostenido por Aerostar -- el listado de importadores y suplidores de combustible de aviación no es igual, es decir, no son los mismos proveedores. Véase, *Alegato de la parte apelante*, pág. 37. Asimismo, cita otra evidencia ofrecida ante los tribunales inferiores para mostrar las razones por las cuales era necesario cambiar -- por medio de la Ley Núm. 206-2014, *infra* -- el proceso de fiscalización del cobro del *fuel fee*. Por consiguiente, citó la contestación a cierto interrogatorio, donde se expresó:

> Al cobrar el derecho por combustible de aviación a los importadores en el muelle habría más control sobre el volumen que entre, permitiendo mejor fiscalización del mismo. Los aeropuertos están abiertos 24 horas al día, 7 días a la semana, y la Autoridad no cuenta con los recursos para fiscalizar 100% del combustible que entra a través de esa vía

la luz de todo lo anterior que la Autoridad nos solicita que revoquemos parcialmente la *Sentencia* emitida por el Tribunal de Apelaciones. Le asiste la razón en parte. Veamos por qué.

II.

A.

De entrada, es útil precisar que -- en nuestra jurisdicción -- las obligaciones "nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia". Art. 1042 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 2992 (derogado).[32] Conforme a ello, la contratación se basa en la autonomía de la voluntad y la habilidad de los contratantes de "establecer los pactos, cláusulas y condiciones que tengan por conveniente[s], siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. ant. 3372 (derogado).

_____

a todas las horas del día. Por el contrario, en el muelle existen ya controles del Departamento de Hacienda que facilitarán la fiscalización por la Autoridad, toda vez que ya cada barcaza tiene que reportar el contenido de su carga. Por otro lado, al cobrárselo a menos entidades (5 importadores versus 10 suplidores), también se simplifica el cobro. Cada camión tiene capacidad para aproximadamente 10,000 galones de combustible, mientras que cada barco tiene capacidad para aproximadamente 3 millones de galones de combustible en promedio (y hasta 10 millones de galones en algunos casos). Por lo tanto, interceptar un solo barco equivale a interceptar 300 camiones o más. Véase, *Alegato de la parte apelante*, pág. 38.

[32] Si bien se ha aprobado un nuevo Código Civil, el citado a través del presente escrito estaba vigente al momento de formularse las relaciones contractuales aquí en controversia.

Dichos contratos, a la luz del principio *pacta sunt servanda*, tienen fuerza de ley entre las partes. Art. 1044 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 2994 (derogado). En otras palabras, "[c]uando las personas contratan [,] crean normas obligatorias; tan obligatorias como la ley misma". J.R. Vélez Torres, *Curso de Derecho Civil: Derecho de Contratos*, San Juan, Ed. Revista Jurídica UIPR, 1990, Tomo IV, Vol. II, pág. 99.

Ahora bien, y en cuanto a la interpretación de las cláusulas de un acuerdo, el Código Civil de 1930, *supra*, disponía que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieran contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquellas". Art. 1233, Código Civil de 1930, 31 LPRA ant. sec. 3471 (derogado). A la luz de lo antes expuesto, esta Curia ha reiterado que "se debe seguir la letra clara del contrato, cuando ésta refleja inequívocamente la voluntad de las partes". (Cita omitida). *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 726 (2001). Véase, también, *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 450 (2007).

No obstante, en las instancias en las que sea necesario que el juzgador se adentre a interpretar la intención de las partes, se atenderán principalmente los actos de los contratantes, coetáneos y posteriores a la otorgación del acuerdo. Art. 1234, Código Civil de 1930,

31 LPRA ant. sec. 3472 (derogado). Véase, *C.F.S.E. v. Unión de Médicos*, *supra.*

Junto a ello, este Tribunal ha señalado que "al momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas". *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 726 (2001). Véase, también, *VDE Corporation v. F&R Contractors*, 180 DPR 21, 35 (2010).

B.

Por otro lado, es menester señalar que la Constitución del Estado Libre Asociado de Puerto Rico postula que "[n]o se aprobarán leyes que menoscaben las obligaciones contractuales".[33] Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1. Dicha cláusula es análoga al Art. I, Sec. 10 de la Constitución Federal.[34]

---

[33] Para un estudio sobre el proceso de aprobación de dicha cláusula, véase: J. Trías Monge, *Historia constitucional de Puerto Rico*, San Juan, Ed. UPR, 1982, Vol. III, págs. 187-188. Para un análisis detallado sobre su concepción y contenido, véase: J.M. Farinacci Fernós, *La Carta de Derechos*, San Juan, Ed. Universidad Interamericana de Puerto Rico, 2021, págs. 137-140.

[34] La referida sección lee:

> **No State shall** enter into any Treaty, Alliance, or Confederation; grant Letters of Marque or Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; **pass** any Bills of Attainder, ex post facto Law, **or Law impairing the Obligation of Contracts**, or grant any Title of Nobility. Art. I, Sec. 10, Const. EE.UU., LPRA, Tomo 1.

Ahora bien, sobre la interpretación de la precitada *Contracts Clause*, el tratadista Erwin Chemerinsky nos dice que:

En esencia, la protección contra el menoscabo de obligaciones contractuales "limita el poder del gobierno para interferir con las obligaciones contractuales entre partes privadas, así como las obligaciones contractuales contraídas por el Estado".[35] *Domínguez Castro v. E.L.A.*, 178 DPR 1, 80 (2010). Véase, también, *Trinidad Hernández v. ELA*, 188 DPR 828, 834 (2013); *Bayrón Toro v. Serra*, 119 DPR 605, 620 (1987).

**Claro está, la disposición de referencia "no constituye una prohibición absoluta que impida el poder de reglamentación del Estado en beneficio del interés público".** *Bayrón Toro v. Serra*, *supra*, pág. 619.[36] Véase, también, *Trinidad Hernández v. ELA*, *supra*, pág. 834. Empero, esta Curia ha reconocido que -- el mencionado poder

---

Since 1937, the Court's deference to government economic regulation has resulted in the contracts clause rarely being used to invalidate state and local laws. In fact, only twice since 1937 has the Supreme Court found laws to violate the contracts clause. Under current law, a government interference with private contracts will be struck down only if there is a 'substantial impairment' of the contract and only if the law fails to reasonably serve a 'significant and legitimate public purpose'. However, a government interference with government contracts will receive greater scrutiny than its interference with private contracts because of distrust of the government when it is acting in its own 'self-interest'. E. Chemerinsky, *Constitutional Law: Principles and Policies*, 5nta ed., Frederick, Wolters Kluwer, 2015, pág. 658.

[35] De forma similar, el *Contracts Clause* de la Constitución de los Estados Unidos fue concebida con el propósito de "encourage trade and credit by promoting confidence in the stability of contractual obligations". (Cita omitida) *United States Trust Co. v. New Jersey*, 431 U.S. 1, 15 (1977). Véase, *Home Bldg. & Loan Ass'n v. Blaisdell*, 209 U.S. 398, 427-428 (1934).

[36] En ese sentido, "[v]ale recordar que las garantías constitucionales se formularon precisamente con el propósito de restringir el ejercicio arbitrario y opresivo de los poderes del Estado". *Warner Lambert Co. v. Tribunal Superior*, *supra*, pág. 394.

de reglamentación -- "por amplio que sea, no es ilimitado. Su ejercicio nunca puede ser arbitrario o irrazonable". *Warner Lambert Co. v. Tribunal Superior*, 101 DPR 378, 394 (1973).

Como norma general, al hacer un análisis sobre la validez de un estatuto a la luz de la cláusula de menoscabo de derechos contractuales, "el criterio aplicable es el de razonabilidad". *Bayrón Toro v. Serra*, *supra*, pág. 620. Por consiguiente, "la función del tribunal consiste en establecer un balance razonable entre el interés social de promover el bien común y el interés, también social, de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de las leyes". *Íd.*

**Así pues, al evaluar la interferencia del Estado con cierta contratación privada, se debe auscultar si existe una relación contractual y si la modificación constituye un menoscabo sustancial o severo.** *Trinidad Hernández v. ELA*, 188 DPR 828, 834-835 (2013). De existir un menoscabo sustancial o severo, prosigue determinar si la interferencia gubernamental responde a un interés legítimo que, a su vez, está racionalmente relacionada con la consecuencia del objetivo. *Íd.*

Ahora bien, la evaluación a la que aludimos cambia en la medida que el Estado modifica sus propias obligaciones. En dichas instancias, "el escrutinio judicial debe ser más cuidadoso para asegurar que la actuación del Estado no

sólo sea en beneficio propio".[37] *Bayrón Toro v. Serra*, *supra*, pág. 620. A raíz de ello, en las instancias de referencia, la modificación -- además de ser razonable -- debe ser "necesaria para adelantar un propósito gubernamental importante". (Énfasis suplido). *Bayrón Toro v. Serra*, *supra*, pág. 620.

En resumen, y cónsono con lo antes expuesto, al entablar un análisis de una modificación de una obligación del gobierno, el primer paso debe ser auscultar si, en efecto, se está ante una obligación contractual cobijada por la Constitución. *Bayrón Toro v. Serra*, *supra*, pág. 620. Segundo, se debe determinar si la modificación constituye un menoscabo de una obligación contractual. *Íd.*, pág. 621.

Superados estos escollos, procede precisar si el menoscabo viola la garantía constitucional sobre los menoscabos a las obligaciones contractuales. Cumplido con lo anterior, y como último paso, si se concluye que la modificación de la obligación es razonable y necesaria --

---

[37] En esa dirección, es menester aludir a lo expresado por el Tribunal Supremo de los Estados Unidos en el caso *United States Trust Co. v. New Jersey*, *supra*:

> As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake…[I]f a state could reduce its financial obligations whenever it wanted to spend the money for what is regarded as an important public purpose, the Contract Clause would provide no protection at all. *United States Trust Co. v. New Jersey*, *supra*, págs. 25-26.

de forma que es dirigida a adelantar un interés público --
- se sostendrá su validez. *Íd.*

### III.

De otra parte, y por ser indispensable en el estudio de las presentes controversias, conviene recordar aquí que, de conformidad con lo dispuesto en la Ley de Alianzas Público Privadas, Ley Núm. 29-2009, 27 LPRA sec. 2601 *et seq.*, una alianza público privada constituye una convergencia de "recursos y esfuerzos del sector público con recursos del sector privado, mediante una inversión conjunta que resulta beneficiosa para ambas partes". Véase, Exposición de Motivos, Ley Núm. 29-2009. Tales alianzas se crean, en esencia, con el propósito de "proveer un servicio a los ciudadanos y ciudadanas, así como para construir u operar una instalación o proyecto de alta prioridad para el Estado, ya sea por su urgencia, necesidad o conveniencia para la ciudadanía".[38] *Íd.*

En ese sentido, al aprobar el estatuto de referencia, la Asamblea Legislativa vislumbraba que:

---

[38] Cónsono con ello, se declaró que la política pública del Estado Libre Asociado de Puerto Rico sería el:

> [F]avorecer y promover el establecimiento de Alianzas Público Privadas para la creación de Proyectos Prioritarios y, entre otras cosas, fomentar el desarrollo y mantenimiento de instalaciones de infraestructura, compartir entre el Estado y el Contratante el riesgo que representa el desarrollo, operación o mantenimiento de dichos proyectos, mejorar los servicios prestados y las funciones del Gobierno, fomentar la creación de empleos, promover el desarrollo socioeconómico y la competitividad de Puerto Rico. Art. 3 de la Ley de Alianzas Público Privadas, 27 LPRA sec. 2602.

En Puerto Rico, el mecanismo de las Alianzas Público Privadas, con los controles adecuados, es una alternativa prometedora para mejorar los servicios del Gobierno, facilitar el desarrollo, construcción, operación y mantenimiento de la infraestructura y liberar recursos financieros del Estado ante la crisis fiscal actual. En el Marco de estas premisas, las Alianzas Público Privadas permiten el desarrollo de proyectos y la prestación de algunos servicios de manera más eficiente y menos costosa, delegando los riesgos inherentes en dicho desarrollo o servicio a la parte mejor capacitada para medir y manejar los mismos. Véase, Exposición de Motivos, Ley Núm. 29-2009.

Para viabilizar dicha intención, se esbozaron los parámetros de las Alianzas Público Privadas, su creación y fiscalización. Entre ellos, y en lo relacionado a los contratos de alianza, el estatuto de referencia dispone que:

(c) *Exención de Procesos para Fijar Tarifas, Derechos y otros Cargos*: **Un Contratante bajo el Contrato de Alianza tendrá la facultad para determinar, fijar, alterar, imponer y cobrar derechos, rentas, tarifas y cualquier otro tipo de cargos por la prestación del Servicio o Función, o la construcción, reparación, mejora y el uso de las Instalaciones**, de conformidad con las disposiciones del Contrato de Alianza. El Contratante, la Entidad Gubernamental Participante y la Autoridad no tendrán que cumplir con los requisitos impuestos a una Entidad Gubernamental bajo las disposiciones de su ley orgánica o leyes especiales pertinentes para incrementar o reducir dichos derechos, rentas, tarifas o cargos, salvo que exista alguna restricción impuesta bajo los contratos de fideicomiso de las mismas que limite dicha capacidad de modificar las mismas. El Contratante, la Entidad Gubernamental y la Autoridad tendrán que cumplir con las disposiciones sobre procedimientos de cambios en las tarifas que serán incluidas en el Contrato

de Alianza, con excepción de los dispuesto en el inciso (b)(x). (Énfasis suplido) Art. 10(c), Ley de Alianzas Público Privadas, 27 LPRA sec. 2609(c).

**De igual manera, y cónsono con la intención de la Asamblea Legislativa, el estatuto de referencia aclara que, "en los casos en que las disposiciones de esta Ley estén en pugna con las disposiciones de cualquier otra ley, prevalecerán las disposiciones de esta Ley".** Art. 24, Ley de Alianzas Público Privadas, 27 LPRA sec. 2601. En ese sentido, el estatuto deja claro la importancia de la aplicación de sus disposiciones.

IV.

Por último, no debemos olvidar que allá para el 1959, la Asamblea Legislativa aprobó la Ley de Imposición y Cobro de Contribución al Combustible de Aviación, Ley Núm. 82 de 26 de junio de 1959, 13 LPRA sec. 4030 *et seq.* Ello, con el propósito de facultar a la Autoridad a imponer y cobrar un derecho sobre el combustible de avión y, de forma relacionada, suspender la imposición y cobro de cierto impuesto sobre el combustible antes descrito. A esos fines, el estatuto de referencia dictamina:

> Por la presente **se suspende la imposición y cobro de la contribución que impone el <u>Artículo 30(a) de la Ley Núm. 2</u>,** aprobada en 20 de enero de 1956, según enmendada, conocida como "Ley de Impuestos Sobre Artículos de Uso y Consumo de Puerto Rico", **en lo que se refiere a gasolina de aviación,** a todo producto combustible para uso o consumo en la propulsión de vehículos de transportación aérea, y a toda mezcla de gasolina con cualquier producto combustible

> para uso o consumo en la propulsión de vehículos de transportación aérea, destinado a consumirse en viajes por aire entre Puerto Rico y otros lugares, o en viajes por aire dentro de los límites territoriales de Puerto Rico, **siempre que la Autoridad de los Puertos imponga un derecho de dos centavos por cada galón o fracción de galón sobre dichos productos en lugar de dicha contribución y lo cobre a los suplidores del mismo que operen en los aeropuertos de Puerto Rico.** El término "suplidor" significa para los efectos de esta ley cualquier persona natural o jurídica que se dedique al negocio de suplir los arriba mencionados productos, como también significará los consumidores de los referidos productos en el caso de que éstos los importen directamente. (Énfasis suplido). Art. 1, Ley Núm. 82 de 26 de junio de 1959, 13 LPRA sec. 4030

Esta Curia tuvo oportunidad de interpretar el texto antes transcrito en *Esso Standard Oil v. A.P.P.R.*, 95 DPR 772 (1968). En apretada síntesis, en aquella ocasión nos correspondió determinar la naturaleza del *fuel fee*, es decir, si era un derecho o contribución. Esto, ante la posible aplicación de cierto estatuto de exención contributiva. Así las cosas, luego de hacer un minucioso análisis de los estatutos aplicables, al igual que el historial legislativo de la Ley Núm. 82 de 26 de junio de 1959, *supra*, concluimos que:

> …[D]e lo expuesto resulta evidente que el derecho que la Asamblea Legislativa autorizó a la recurrida [Autoridad de los Puertos] a cobrar, es, en efecto, un derecho (fee) por servicio o uso de facilidades y no una contribución como aquella a la cual sustituyó, y por lo tanto su autorización no peca de inconstitucional o de ilegalidad, pues:

(1)   Se cobra por el uso de facilidades para suplir combustible a líneas aéreas en los aeropuertos y no por la introducción, venta, uso o consumo de dicho combustible […]

En la actualidad, las disposiciones de la Ley Núm. 82, *supra*, fueron -- en esencia -- integradas a la Sección 3020.06 del Código de Rentas Internas de Puerto Rico de 2011, 13 LPRA sec. 31626. Este leía, en lo pertinente, de la siguiente manera:

**(a)** Se impondrá, cobrará y pagará el arbitrio que a continuación se indica sobre cada galón o fracción de galón de los siguientes combustibles:
(1) Gasolina                                    16¢
**(2) Combustible de avión                 3¢**
(3) *Gas oil* o *diesel oil* o                8¢
   cualquier otro combustible
                  …

**(g) De conformidad con la Ley Núm. 82 de 26 de junio de 1959, según enmendada, se suspenderá la imposición y cobro de arbitrio sobre gasolina fijado en el inciso (a)(1) de esta sección cuando se trate de gasolina de aviación** y de cualquier otro producto combustible para uso o consumo en la propulsión de vehículos de transportación aérea que sea destinado a consumirse en viajes por aire entre Puerto Rico y otros lugares, o en viajes por aire dentro de los límites territoriales de Puerto Rico, **siempre y cuando, en lugar del impuesto fijado en esta sección, la Autoridad de los Puertos imponga sobre dichos productos un derecho de dos (2) centavos por galón o fracción de galón y lo cobre a los suplidores que operen en los aeropuertos de Puerto Rico.** (Énfasis suplido). Código de Rentas Internas, 13 LPRA sec. 31626.

No obstante, ante la dificultad de hacer un recaudo efectivo del derecho de dos centavos ($0.02) -- o, según

hemos aludido anteriormente al mismo, el *fuel fee* --, la Asamblea Legislativa aprobó la Ley Núm. 206-2014. Mediante ésta, se transfirió la responsabilidad del pago del *fuel fee* a los importadores en lugar de los suplidores, de forma que se pudiese acceder a los fondos antes en la cadena de distribución. A su vez, impuso el pago del derecho antes descrito a la Autoridad. En particular, la Asamblea Legislativa señaló que "[i]mponer el pago del derecho al importador no solo facilitaría la labor de la Autoridad de los Puertos, sino que también aumentaría la captación del referido derecho y resultaría en un aumento en la captación del mismo". Exposición de Motivos, Ley Núm. 206-2014.

Cónsono con este cambio, eventualmente también se aprobó el *Reglamento para el cobro del derecho por galón sobre combustible de avión*, Reglamento Núm. 8897, Autoridad de los Puertos, 30 de diciembre de 2016 (en adelante, "Reglamento Núm. 8897"). Según surge de la Sección 3.0 de éste, su propósito es disponer las normas que garanticen el cobro del derecho a los importadores de manera simple y eficiente para la Autoridad. Reglamento Núm. 8897, *supra*, pág. 4. Por derecho, se refiere a los "dos (2) centavos por galón o por fracción de galón, que la Ley Núm. 1-2011, según enmendada, autoriza a la Autoridad a imponer y cobrarlo a los importadores de combustible, que se utilice para el consumo de la propulsión de vehículos de transportación aérea". Reglamento Núm. 8897, *supra*, pág. 6. A tenor con ello, las

disposiciones del Reglamento Núm. 8897, *supra*, aplicarían a todo importador de gasolina de aviación, según definida en el cuerpo reglamentario de referencia. Reglamento Núm. 8897, *supra*, pág. 4.

Ahora bien, es imperativo señalar que el Reglamento Núm. 8897, *supra*, hace una clara distinción entre importador y suplidor. Por un lado, se considera <u>importador</u> "[c]ualquier persona natural o jurídica que se dedique al negocio de importar combustible de aviación", mientras que un <u>suplidor y/o detallista</u> es "[t]oda persona natural o jurídica que se dedique al negocio de suplir gasolina de aviación al detal". Reglamento Núm. 8897, *supra*, pág. 7.

Es, pues, a la luz de la normativa antes expuesta, que -- desde el disenso -- procedemos a disponer del caso que nos ocupa.

V.

Como mencionamos anteriormente, en el presente caso la Autoridad señala que el Tribunal de Apelaciones incidió al malinterpretar el texto de la Ley Núm. 82 de 26 de junio de 1959, *supra*. A su vez, alega que el foro *a quo* erró al efectuar una lectura incorrecta de los contratos en controversia y hacer un uso selectivo de cierta prueba extrínseca. Finalmente, la Autoridad aduce que el foro apelativo intermedio incidió al declarar inconstitucional la Ley Núm. 206-2014, *supra*, cuando Aerostar no tiene derecho contractual para cobrar el *fuel fee*. Como

adelantamos, la Autoridad tiene razón en parte. Nos explicamos.

De entrada, y como ya hemos señalado, de una lectura serena de los contratos aquí en controversia, era forzoso concluir que -- al otorgar el *Lease Agreement* y subsiguientes acuerdos -- la Autoridad cedió válidamente el cobro de los derechos e ingresos provenientes de las operaciones del aeropuerto, incluyendo el *fuel fee*. Entendemos que el lenguaje de los contratos es claro en cuanto a su inclusión. Ello, junto a la clara política pública establecida por medio de la Ley de Alianzas Público Privadas, *supra*, al igual que su diáfana instrucción sobre la facultad de cobrar derechos, hace ineludible nuestra conclusión.

Ahora bien, habiendo contestado la primera pregunta en la afirmativa, contrario al proceder de la mayoría de mis compañeros y compañera, debimos proseguir con el estudio de la controversia constitucional sobre el menoscabo de obligaciones contractuales que subyace en el presente litigio. Así, como segundo paso, y establecido que en el presente caso existe la obligación contractual de que sea Aerostar -- y no la Autoridad -- quien cobre el *fuel fee*, nos correspondía examinar si -- con la aprobación de la Ley Núm. 206-2014 -- se ha efectuado un menoscabo a dicha obligación contractual. Ello, claro está, teniendo en mente que no todo menoscabo es *per se* inconstitucional.

En esa dirección, el hecho de que Aerostar no cobrará y/o perderá determinada cantidad de dinero correspondiente al *fuel fee* aquí en controversia -- por el término del *Lease Agreement* -- sin duda pudiese representar un menoscabo a la obligación contractual pactada entre esta última y la Autoridad. **No obstante, de un cuidadoso estudio del voluminoso expediente ante nuestra consideración, no surge evidencia alguna, conforme lo exige la normativa antes expuesta, sobre la sustancialidad y la severidad del menoscabo que se alega que se llevó a cabo.** Lo anterior, ya que, a grandes rasgos, Aerostar se limita a señalar que la aprobación de la Ley Núm. 206-2014 constituye un menoscabo sustancial al afectar adversamente los términos o condiciones esenciales del *Lease Agreement* -- particularmente, los fondos generados por el *fuel fee* -- y frustra las expectativas razonables de dicha entidad.[39] **Tales alegaciones, por sí solas, no nos parecen suficientes para superar el estándar requerido en los casos de menoscabo de obligaciones contractuales.**

Por eso, nos vemos impedidos de concluir que el menoscabo efectuado en el presente caso es uno <u>sustancial</u>, y <u>severo</u> según exigido por la jurisprudencia interpretativa. Particularmente cuando, a diferencia de Aerostar, la Autoridad sí ha señalado motivaciones

---

[39] En cuanto a ello, puntualiza en el dinero invertido por ésta para el perfeccionamiento del *Lease Agreement*, las mejoras capitales realizadas en el Aeropuerto, así como sus responsabilidades en virtud del referido acuerdo. Véase, *Alegato de la parte apelada Aerostar Airport Holdings LLC*, pág. 37.

razonables para la aprobación de la Ley Núm. 206-2014, *supra*, y su *Reglamento*, *supra*.

Así pues, no habiéndose superado esta etapa, nuestro análisis no se extiende a los restantes pasos expuestos en la doctrina constitucional pertinente. De ahí que, era forzado resolver que la Ley Núm. 206-2014, *supra*, y su *Reglamento* son constitucionales.

Establecido lo anterior, y a base de lo aquí discutido, **entendemos que le correspondía a los importadores emitir un pago único a la Autoridad de Puertos de Puerto Rico.** Ello, en virtud de la Ley Núm. 206-2014, *supra,* la cual fue aprobada bajo un ejercicio constitucional de poder de Estado, y no empece a la cesión válidamente hecha por medio del *Lease Agreement* otorgado por la Autoridad y Aerostar. Se cometieron pues, en parte, los errores señalados.

VI.

Por los fundamentos antes expuestos, disentimos del curso de acción seguido por una mayoría de este Tribunal en el día de hoy.

Ángel Colón Pérez
Juez Asociado